## UNITED STATES v. ENMONS et al.

No. 71–1193.  Argued December 4, 1972—
Decided February 22, 1973

STEWART, J., delivered the opinion of the Court, in which BREN-
NAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined.  BLACKMUN,
J., filed a concurring opinion, *post*, p. 412.  DOUGLAS, J., filed a dis-
senting opinion, in which BURGER, C. J., and POWELL and REHNQUIST,
JJ., joined, *post*, p. 413.

*William Bradford Reynolds* argued the cause for the
United States.  With him on the briefs were *Solicitor
General Griswold, Assistant Attorney General Petersen,*
and *Jerome M. Feit.*

*Bernard Dunau* argued the cause for appellees.  With
him on the briefs were *Louis Sherman, Thomas X. Dunn,
Elihu I. Leifer, Alex W. Wall,* and *Sam J. D'Amico.**

MR. JUSTICE STEWART delivered the opinion of the
Court.

A one-count indictment was returned in the United
States District Court for the Eastern District of Loui-

---

*Briefs of *amici curiae* urging reversal were filed by *Milton Smith*
and *Jerry Kronenberg* for the Chamber of Commerce of the United
States, and by *Arthur B. Hanson* and *Ralph N. Albright, Jr.,* for
the American Newspaper Publishers Association.

*J. Albert Woll, Laurence Gold,* and *Thomas E. Harris* filed a brief
for the American Federation of Labor and Congress of Industrial
Organizations as *amicus curiae* urging affirmance.

siana charging the appellees with a violation of the Hobbs Act, 18 U. S. C. § 1951. In pertinent part, that Act provides:

> "(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

"Extortion" is defined in the Act, as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." 18 U. S. C. § 1951 (b)(2).

At the time of the alleged conspiracy, the employees of the Gulf States Utilities Company were out on strike. The appellees are members and officials of labor unions that were seeking a new collective-bargaining agreement with that company. The indictment charged that the appellees and two named coconspirators conspired to obstruct commerce, and that as part of that conspiracy, they

> "would obtain the property of the Gulf States Utilities Company in the form of wages and other things of value with the consent of the Gulf States Utilities Company . . . , such consent to be induced by the wrongful use of actual force, violence and fear of economic injury by [the appellees] and coconspirators, in that [the appellees] and the coconspirators did commit acts of physical violence and destruction against property owned by the Gulf States Utilities Company in order to force said

Company to agree to a contract with Local 2286 of the International Brotherhood of Electrical Workers calling for higher wages and other monetary benefits."

Five specific acts of violence were charged to have been committed in furtherance of the conspiracy—firing high-powered rifles at three Company transformers, draining the oil from a Company transformer, and blowing up a transformer substation owned by the Company. In short, the indictment charged that the appellees had conspired to use and did in fact use violence to obtain for the striking employees higher wages and other employment benefits from the Company.

The District Court granted the appellees' motion to dismiss the indictment for failure to state an offense under the Hobbs Act. 335 F. Supp. 641. The court noted that the appellees were union members on strike against their employer, Gulf States, and that both the strike and its objective of higher wages were legal. The court expressed the view that if "the wages sought by violent acts are wages to be paid for unneeded or unwanted services, or for no services at all," then that violence would constitute extortion within the meaning of the Hobbs Act. *Id.*, at 645. But in this case, by contrast, the court noted that the indictment alleged the use of force to obtain legitimate union objectives: "The union had a right to disrupt the business of the employer by lawfully striking for higher wages. Acts of violence occurring during a lawful strike and resulting in damage to persons or property are undoubtedly punishable under State law. To punish persons for such acts of violence was not the purpose of the Hobbs Act." *Id.*, at 646. The court found "no case where a court has gone so far as to hold the type of activity involved here to be a violation of the Hobbs Act." *Id.*, at 645.

We noted probable jurisdiction of the Government's appeal, 406 U. S. 916,[1] to determine whether the Hobbs Act proscribes violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective-bargaining demands.

## I

The Government contends that the statutory language unambiguously and without qualification proscribes interference with commerce by "extortion," and that in terms of the statute, "extortion" is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." Wages are the "property" of the employer, the argument continues, and strike violence to obtain such "property" thus falls within the literal proscription of the Act. But the language of the statute is hardly as clear as the Government would make it out to be. Its interpretation of the Act slights the wording of the statute that proscribes obtaining property only by the "wrongful" use of actual or threatened force, violence, or fear. The term "wrongful," which on the face of the statute modifies the use of each of the enumerated means of obtaining property—actual or threatened force, violence, or fear [2]—would be superfluous if it only served to describe the means used. For it would be redundant to speak of "wrongful violence" or "wrongful force" since,

---

[1] This appeal was taken under 18 U. S. C. § 3731 (1964 ed.). The 1971 amendment to the Criminal Appeals Act, providing that all appeals from dismissals of indictments or informations must be taken to the Courts of Appeals, does not apply to cases instituted before January 2, 1971. Omnibus Crime Control Act of 1970, Pub. Law No. 91–644, § 14 (a), 84 Stat. 1890, codified, 18 U. S. C. § 3731. See *United States* v. *Jorn,* 400 U. S. 470, 474 n. 1, 477–478, n. 6. The present indictment was filed on October 15, 1970.

[2] Congressman Hobbs indicated that "wrongful" was to modify the entire section. 91 Cong. Rec. 11908.

as the Government acknowledges, any violence or force to obtain property is "wrongful." [3] Rather, "wrongful" has meaning in the Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be "wrongful" because the alleged extortionist has no lawful claim to that property.

Construed in this fashion, the Hobbs Act has properly been held to reach instances where union officials threatened force or violence against an employer in order to obtain personal payoffs,[4] and where unions used the proscribed means to exact "wage" payments from employers in return for "imposed, unwanted, superfluous and fictitious services" of workers.[5] For in those situations, the employer's property has been misappropriated. But the literal language of the statute will not bear the Government's semantic argument that the Hobbs Act reaches the use of violence to achieve legitimate union objectives, such as higher wages in return for genuine services which the employer seeks. In that type of case, there has been no "wrongful" taking of the employer's property; he has paid for the services he bargained for, and the workers receive the wages to which they are entitled in compensation for their services.

---

[3] The Government suggests a convoluted construction of "wrongful." It concedes that when the means used are not "wrongful," such as where fear of economic loss from a strike is employed, then the objective must be illegal. If, on the other hand, "wrongful" force and violence are used, even for a legal objective, the Government contends that the statute is satisfied. But that interpretation simply accepts the redundancy of the term "wrongful" whenever it applies to "force" and "violence" in the statute.

[4] See, e. g., United States v. Iozzi, 420 F. 2d. 512; United States v. Kramer, 355 F. 2d 891, cert. granted and case remanded for resentencing, 384 U. S. 100; Bianchi v. United States, 219 F. 2d 182.

[5] See, e. g., United States v. Green, 350 U. S. 415, 417; United States v. Kemble, 198 F. 2d 889.

## II

The legislative framework of the Hobbs Act dispels any ambiguity in the wording of the statute and makes it clear that the Act does not apply to the use of force to achieve legitimate labor ends. The predecessor of the Hobbs Act, § 2 of the Anti-Racketeering Act of 1934, 48 Stat. 979,[6] proscribed, in connection with interstate commerce, the exaction of valuable consideration by force, violence, or coercion, "not including, however, the payment of wages by a bona-fide employer to a bona-fide employee . . . ."[7] In *United States* v. *Local 807*, 315 U. S. 521, the Court held that this exception cov-

[6] Section 2 of the Act provided:

"Any person who, in connection with or in relation to any act in any way or in any degree affecting trade or commerce or any article or commodity moving or about to move in trade or commerce—

"(a) Obtains or attempts to obtain, by the use of or attempt to use or threat to use force, violence, or coercion, the payment of money or other valuable considerations, or the purchase or rental of property or protective services, not including, however, the payment of wages by a bona-fide employer to a bona-fide employee; or

"(b) Obtains the property of another, with his consent, induced by wrongful use of force or fear, or under color of official right; or

"(c) Commits or threatens to commit an act of physical violence or physical injury to a person or property in furtherance of a plan or purpose to violate sections (a) or (b); or

"(d) Conspires or acts concertedly with any other person or persons to commit any of the foregoing acts; shall, upon conviction thereof, be guilty of a felony and shall be punished by imprisonment from one to ten years or by a fine of $10,000, or both."

[7] See § 2 (a), quoted in n. 6, *supra*. While the specific wage exception was found only in § 2 (a) of the Act, § 3 (b) excluded "wages paid by a bona-fide employer to a bona-fide employee" from the definition of "property," "money," or other "valuable considerations." The wage exception thus permeated the entire Act. *United States* v. *Green*, 350 U. S., at 419 n. 4; *United States* v. *Local 807*, 315 U. S. 521, 527 n. 2.

ered the members of a New York City truck drivers union who, by violence or threats, exacted payments for themselves from out-of-town truckers in return for the unwanted and superfluous service of driving out-of-town trucks to and from the city. The New York City teamsters would lie in wait for the out-of-town trucks, and then demand payment from the owners and drivers in return for allowing the trucks to proceed into the city. The teamsters sometimes drove the arriving trucks into the city, but in other instances, the out-of-town truckers paid the fees but rejected the teamsters' services and drove the trucks themselves. In several cases there was evidence that, having exacted their fees, the city drivers disappeared without offering to perform any services at all. *Id.*, at 526. See also *id.*, at 539 (Stone, C. J., dissenting). The Court held that the activities of the city teamsters were included within the wage exception to the Anti-Racketeering Act although what work they performed was unneeded and unwanted, and although in some cases their work was rejected.

Congressional disapproval of this decision was swift. Several bills [8] were introduced with the narrow purpose of correcting the result in the *Local 807* case.[9] H. R. 32, which became the Hobbs Act, 60 Stat. 420, eliminated the wage exception that had been the basis for the *Local 807* decision.[10] But, as frequently emphasized

---

[8] S. 2347, 77th Cong., 2d Sess.; H. R. 6872, 77th Cong., 2d Sess.; H. R. 7067, 77th Cong., 2d Sess.; H. R. 653, 78th Cong., 1st Sess.; H. R. 32, 79th Cong., 1st Sess. See *Callanan* v. *United States*, 364 U. S. 587, 591 n. 5; *United States* v. *Green, supra*, at 419 n. 5.

[9] See *United States* v. *Green, supra*, at 419 n. 5; Note, Labor Faces the Amended Anti-Racketeering Act, 101 U. Pa. L. Rev. 1030, 1033–1034 (1953).

[10] The Hobbs Act also eliminated the proviso in § 6 of the Anti-Racketeering Act of 1934: "That no court of the United States shall construe or apply any of the provisions of this Act in such manner as to impair, diminish, or in any manner affect the rights of bona-

on the floor of the House, the limited effect of the bill was to shut off the possibility opened up by the *Local 807* case, that union members could use their protected status to exact payments from employers for imposed, unwanted, and superfluous services. As Congressman Hancock explained:

> "This bill is designed simply to prevent both union members and nonunion people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce. That is all it does.

> . . . . .

> "[T]his bill is made necessary by the amazing decision of the Supreme Court in the case of the United States against Teamsters' Union 807, 3 years ago. That decision practically nullified the anti-racketeering bill of 1934 . . . . In effect the Supreme Court held that . . . members of the Teamsters' Union . . . were exempt from the provisions of that law when attempting by the use of force or the threat of violence to obtain wages for a job whether they rendered any service or not." 91 Cong. Rec. 11900.

Congressman Hancock proceeded to read approvingly from an editorial which characterized the teamsters' action in the *Local 807* case as "compelling the truckers to pay day's wages to local union drivers whose services were neither wanted nor needed." *Ibid.* Congressman Fellows stressed the fact that the facts of the *Local 807*

---

fide labor organizations in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States." That proviso was one of the supports for the *Local 807* decision, see 315 U. S., at 535, and it was eliminated to prevent reliance on that clause as a means of resuscitating the *Local 807* decision. See 91 Cong. Rec. 11912 (remarks of Rep. Hobbs).

case showed that "these stick-up men disappeared as soon as the money was paid without rendering or offering to render any service." *Id.*, at 11907. And Congressman Rivers characterized the facts of the *Local 807* case as "nothing short of hijacking, intimidation, extortion, and out-and-out highway robbery." *Id.*, at 11917.[11]

But by eliminating the wage exception to the Anti-Racketeering Act, the Hobbs Act did not sweep within its reach violence during a strike to achieve legitimate collective-bargaining objectives. It was repeatedly emphasized in the debates that the bill did not "interfere in any way with any legitimate labor objective or activity"; [12] "there is not a thing in it to interfere in the slightest degree with any legitimate activity on the part of labor people or labor unions . . . ." [13] And Congressman Jennings, in responding to a question concerning the Act's coverage, made it clear that the Act "does not have a thing in the world to do with strikes." *Id.*, at 11912.

Indeed, in introducing his original bill, Congressman Hobbs [14] explicitly refuted the suggestion that strike vio-

---

[11] See also 91 Cong. Rec. 11842 (remarks of Rep. Michener); *id.*, at 11905 (remarks of Rep. Robsion); *id.*, at 11909 (remarks of Rep. Sumners); *id.*, at 11912–11913 (remarks of Rep. Whittington).

In its report on the bill, the House Committee on the Judiciary reproduced this Court's decision in the *Local 807* case and concluded that "[t]he need for the legislation was emphasized by the opinion of the Supreme Court in . . . *United States* v. *Local 807* . . . ." H. R. Rep. No. 238, 79th Cong., 1st Sess., 10. See also S. Rep. No. 1516, 79th Cong., 2d Sess.

[12] 91 Cong. Rec. 11841 (remarks of Rep. Walter).

[13] *Id.*, at 11908 (remarks of Rep. Sumners). See also *id.*, at 11900 (remarks of Rep. Hancock); *id.*, at 11904 (remarks of Rep. Gwynne); *id.*, at 11909 (remarks of Rep. Vursell).

[14] The remarks with respect to that bill, H. R. 653, 78th Cong., 1st Sess., which passed only the House, are wholly relevant to an under-

lence to achieve a union's legitimate objectives was encompassed by the Act: [15]

"Mr. MARCANTONIO. All right. In connection with a strike, if an incident occurs which involves—

"Mr. HOBBS. The gentleman need go no further. This bill does not cover strikes or any question relating to strikes.

"Mr. MARCANTONIO. Will the gentleman put a provision in the bill stating so?

"Mr. HOBBS. We do not have to, because a strike is perfectly lawful and has been so described by the Supreme Court and by the statutes we have passed. This bill takes off from the springboard that the act must be unlawful to come within the purview of this bill.

"Mr. MARCANTONIO. That does not answer my point. My point is that an incident such as a simple assault which takes place in a strike could happen. Am I correct?

"Mr. HOBBS. Certainly.

"Mr. MARCANTONIO. That then could become an extortion under the gentleman's bill, and

---

standing of the Hobbs Act, since the operative language of the original bill was substantially carried forward into the Act. The congressional debates on the Hobbs Act in the 79th Congress repeatedly referred to the legislative history of the original bill. See 91 Cong. Rec. 11842 (remarks of Rep. Michener); *id.*, at 11899–11900 (remarks of Rep. Hancock); *id.*, at 11900 (remarks of Rep. Hobbs). Surely an interpretation placed by the sponsor of a bill on the very language subsequently enacted by Congress cannot be dismissed out of hand, as the dissent would have it, simply because the interpretation was given two years earlier.

[15] See also 89 Cong. Rec. 3202 (remarks of Rep. Gwynne) (Act does not cover "a clash between strikers and scabs during a strike").

that striker as well as his union officials could be charged with violation of sections in this bill.

"Mr. HOBBS. I disagree with that and deny it in toto." 89 Cong. Rec. 3213.[16]

---

[16] The proponents of the Hobbs Act defended the Act as no encroachment on the legitimate activities of labor unions on the ground that the statute did no more than incorporate New York's conventional definition of extortion—"the obtaining of property from another . . . with his consent, induced by a wrongful use of force or fear, or under color of official right." N. Y. Penal Law § 850 (1909). See 91 Cong. Rec. 11842 (remarks of Rep. Walter); *id.*, at 11843 (remarks of Rep. Michener); *id.*, at 11900 (remarks of Rep. Hancock); *ibid.* (remarks of Rep. Hobbs); *id.*, at 11906 (remarks of Rep. Robsion). See also *United States* v. *Caldes*, 457 F. 2d 74, 77; *United States* v. *Provenzano*, 334 F. 2d 678, 686.

Judicial construction of the New York statute reinforces the conclusion that, however militant, union activities to obtain higher wages do not constitute extortion. For extortion requires an intent " 'to obtain that which in justice and equity the party is not entitled to receive.' " *People* v. *Cuddihy*, 151 Misc. 318, 324, 271 N. Y. S. 450, 456, aff'd, 243 App. Div. 694, 277 N. Y. S. 960; see *People* v. *Weinseimer*, 117 App. Div. 603, 616, 102 N. Y. S. 579, 588, aff'd, 190 N. Y. 537, 83 N. E. 1129. An accused would not be guilty of extortion for attempting to achieve legitimate labor goals; he could not be convicted without sufficient evidence that he "was actuated by the purpose of obtaining a financial benefit for himself . . . and was not attempting in good faith to advance the cause of unionism . . . ." *People* v. *Adelstein*, 9 App. Div. 2d 907, 908, 195 N Y. S. 2d 27, 28, aff'd *sub nom. People* v. *Squillante*, 8 N. Y. 2d 998, 169 N. E. 2d 425.

Hence, New York's highest court has interpreted its extortion statute to apply to a case where the accused received a payoff to buy an end to labor picketing. *People* v. *Dioguardi*, 8 N. Y. 2d 260, 168 N. E. 2d 683.

"The picketing here . . . may have been perfectly lawful in its inception (assuming it was part of a bona fide organizational effort) and may have remained so—despite its potentially ruinous effect on the employers' businesses—so long as it was employed to accomplish the legitimate labor objective of organization. Its entire character changed from legality to criminality, however, when it

The Government would derive a different lesson from the legislative history. It points to statements made during the floor debates that the Act was meant to have "broad coverage" and, unlike its predecessor, to encompass the "employer-employee" relationship. But that proves no more than that the achievement of illegitimate objectives by employees or their representatives, such as the exaction of personal payoffs, or the pursuit of "wages" for unwanted or fictitious services, would not be exempted from the Act solely because the extortionist was an employee or union official and the victim an employer.[17] The Government would also find support for its expansive interpretation of the statute in the rejection of two amendments, one proposed by Congressman Celler, the other by Congressman LaFollette, which would have inserted in the Act an exception for cases where violence was used to obtain the payment of wages by a bona-fide employer to a bona-fide employee. See 91 Cong. Rec. 11913, 11917, and 11919, 11922. But both amendments were rejected

---

was used as a pressure device to exact the payment of money as a condition of its cessation . . . ." *Id.*, at 271, 168 N. E. 2d, at 690–691.

In short, when the objectives of the picketing changed from legitimate labor ends to personal payoffs, then the actions became extortionate.

[17] The Government relies heavily on a statement by Congressman Michener, in a dialogue with two of his colleagues, to the effect that union members who "by robbery or exploitation collect a day's wage—a union wage—they are not exempted from the law solely because they are engaging in a legitimate union activity." 91 Cong. Rec. 11843–11844. But Congressman Michener was referring to the activity of "robbery or exploitation," and his statement continued: "I cannot understand how any union man can claim that the conduct described by Mr. Justice Stone is a legitimate union activity." *Id.*, at 11844. Mr. Chief Justice Stone's dissenting opinion in the *Local 807* case described payoffs for the superfluous and unwanted work involved in that case. See 315 U. S., at 539.

solely because they would have operated to continue the effect of the *Local 807* case.[18]    Their rejection thus proves nothing more than that Congress was intent on undoing the restrictive impact of that case.

## III

In the nearly three decades that have passed since the enactment of the Hobbs Act, no reported case has upheld the theory that the Act proscribes the use of force to achieve legitimate collective-bargaining demands.

The only previous case in this Court relevant to the issue, *United States* v. *Green,* 350 U. S. 415, held no more than that the Hobbs Act had accomplished its objective of overruling the *Local 807* case.    The alleged extortions in that case, as in *Local 807,* consisted of attempts to obtain so-called wages for "imposed, unwanted, superfluous and fictitious services of laborers . . . ."    *Id.,* at 417.    The indictment charged that the employer's consent was obtained "by the wrongful use, to wit, the use for the purposes aforesaid, of actual and threatened force, violence and fear . . . ."    *Ibid.*    The Government thus did not rely, as it does in the present case, solely on the use of force in an employer-employee relationship; it alleged a wrongful purpose—to obtain money from the employer that the union officials had no legitimate right to demand.    We concluded that the Hobbs Act could reach extortion in an employer-employee relationship and that personal profit to the extortionist was not required, but our holding was carefully limited to the charges in that case: "We rule only on the allegations of the indictment and hold that the acts charged against appellees fall within the terms of the Act."    *Id.,* at 421.

_____

[18] See 91 Cong. Rec. 11914 (remarks of Rep. Hobbs); *ibid.* (remarks of Rep. Walter); *id.,* at 11920 (remarks of Rep. Gwynne).

A prior decision in the Third Circuit, *United States* v. *Kemble,* 198 F. 2d 889, on which the Government relied in *Green,* also concerned the exaction, by threats and violence, of wages for superfluous services. In affirming a conviction under the Hobbs Act of a union business agent for using actual and threatened violence against an out-of-town driver in an attempt to force him to hire a local union member, the Court of Appeals carefully limited its holding:

> "We need not consider the normal demand for wages as compensation for services desired by or valuable to the employer. It is enough for this case, and all we decide, that payment of money for imposed, unwanted and superfluous services . . . is within the language and intendment of the statute." *Id.,* at 892.

Most recently, in *United States* v. *Caldes,* 457 F. 2d 74, the Court of Appeals for the Ninth Circuit was squarely presented with the question at issue in this case. Two union officials were convicted of Hobbs Act violations in that they damaged property of a company with which they were negotiating for a collective-bargaining agreement, in an attempt to pressure the company into agreeing to the union contract. Concluding that the Act was not intended to reach militant activity in the pursuit of legitimate unions ends, the court reversed the convictions and ordered the indictment dismissed.

Indeed, not until the indictments were returned in 1970 in this and several other cases has the Government even sought to prosecute under the Hobbs Act actual or threatened violence employed to secure a union contract "calling for higher wages and other monetary benefits." [19]

---

[19] As noted above, the indictment in *United States* v. *Caldes,* 457 F. 2d 74, was ordered to be dismissed by the Ninth Circuit. Two

Yet, throughout this period, the Nation has witnessed countless economic strikes, often unfortunately punctuated by violence. It is unlikely that if Congress had indeed wrought such a major expansion of federal criminal jurisdiction in enacting the Hobbs Act, its action would have so long passed unobserved. See *United States* v. *Laub,* 385 U. S. 475, 485.

## IV

The Government's broad concept of extortion—the "wrongful" use of force to obtain even the legitimate union demands of higher wages—is not easily restricted. It would cover all overtly coercive conduct in the course of an economic strike, obstructing, delaying, or affecting commerce. The worker who threw a punch on a picket line, or the striker who deflated the tires on his employer's truck would be subject to a Hobbs Act prosecution and the possibility of 20 years' imprisonment and a $10,000 fine.[20]

---

similar indictments returned in the Southern District of Florida were dismissed by the District Court without opinion in June 1970. *United States* v. *Rutcofsky,* No. 70–101–CR–JE, June 24, 1970; *United States* v. *Schiffman,* No. 70–102–CR–JE, June 25, 1970. An additional indictment, based on a similar theory of the Hobbs Act, was filed in the Eastern District of New York on January 12, 1972, and is currently pending. *United States* v. *Spero,* No. 72–CR–17.

The briefs in the present case advise us of one other Hobbs Act prosecution that may have been brought under this theory—a 1962 indictment in *United States* v. *Webb,* ND Ala., No. 15080.

[20] Realizing the breadth of its argument, the Government's brief concedes that there might be an exception for "the incidental injury to person or property that not infrequently occurs as a consequence of the charged atmosphere attending a prolonged labor dispute . . . ." But nothing, either in the language or the history of the Act, justifies any such exception.

Similarly, there is nothing to support the dissent's exception for

Even if the language and history of the Act were less clear than we have found them to be, the Act could not properly be expanded as the Government suggests—for two related reasons. First, this being a criminal statute, it must be strictly construed, and any ambiguity must be resolved in favor of lenity. *United States* v. *Wiltberger,* 5 Wheat. 76, 95; *United States* v. *Halseth,* 342 U. S. 277, 280; *Bell* v. *United States,* 349 U. S. 81, 83; *Arroyo* v. *United States,* 359 U. S. 419, 424; *Rewis* v. *United States,* 401 U. S. 808, 812. Secondly, it would require statutory language much more explicit than that before us here to lead to the conclusion that Congress intended to put the Federal Government in the business of policing the orderly conduct of strikes. Neither the language of the Hobbs Act nor its legislative history can justify the conclusion that Congress intended to work such an extraordinary change in federal labor law or such an unprecedented incursion into the criminal jurisdiction of the States. See *San Diego Bldg. Trades Council* v. *Garmon,* 359 U. S. 236, 247–248; *United Constr. Workers* v. *Laburnum Constr. Corp.,* 347 U. S. 656, 665; *Garner* v. *Teamsters Local 776,* 346 U. S. 485, 488; *UAW Local 232* v. *Wisconsin Employment Relations Bd.,* 336 U. S. 245, 253.

As we said last Term:

"[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. . . . [W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive

---

"mischievous" conduct, *post,* at 418 n. 17, even if we could begin to define the meaning and limits of such a term.

relation between federal and state criminal jurisdiction." *United States* v. *Bass,* 404 U. S. 336, 349 (footnotes omitted).

The District Court was correct in dismissing the indictment. Its judgment is affirmed.

*It is so ordered.*

MR. JUSTICE BLACKMUN, concurring.

I join the Court's opinion. I readily concede that my visceral reaction to immaturely conceived acts of violence of the kind charged in this indictment is that such acts deserve to be dignified as federal crimes. That reaction on my part, however, is legislative in nature rather than judicial. If Congress wishes acts of that kind to be encompassed by a federal statute, it has the constitutional power in the interstate context to effect that result. The appellees so concede. Tr. of Oral Arg. 18–19. But MR. JUSTICE STEWART has gathered the pertinent and persuasive legislative history demonstrating that Congress did not intend to exercise its power to reach these acts of violence.

The Government's posture, with its concession that certain strike violence (which it would downgrade as "incidental" and the dissent as "low level," *post,* at 418 n. 17), although aimed at achieving a legitimate end, is not covered by the Act, necessarily means that the legislation would be enforced selectively or, at the least, would embroil all concerned with drawing the distinction between major and minor violence. That, for me, is neither an appealing prospect nor solid support for the position taken.

This type of violence, as the Court points out, is subject to state criminal prosecution. That is where it must remain until the Congress acts otherwise in a manner far more clear than the language of the Hobbs Act.

Mr. Justice Douglas, with whom The Chief Justice, Mr. Justice Powell, and Mr. Justice Rehnquist concur, dissenting.

The Court today achieves by interpretation what those who were opposed to the Hobbs Act were unable to get Congress to do. The Court considers primarily the legislative history of a predecessor bill considered by the 78th Congress. The bill before us was considered and enacted by the 79th Congress; and, as I read the debates, the opposition lost in the 79th Congress what they win today. All of which makes pertinent Mr. Justice Holmes' admonition in *Missouri, K. & T. R. Co. v. May,* 194 U. S. 267, 270, that "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts."

In *United States* v. *Local 807,* 315 U. S. 521, we had before us the Anti-Racketeering Act of 1934, 48 Stat. 979, which made it a crime to use violence respecting interstate trade or commerce to obtain the "payment of money or other valuable considerations," excluding "the payment of wages by a bona-fide employer to a bona-fide employee." We held that the exception included demands for unwanted or superfluous services and covered those who wanted jobs, not only those who presently had them.

Congress in the Hobbs Act changed the law. The critical change was the exclusion of the employer-employee clause. The Court said in *United States* v. *Green,* 350 U. S. 415, 419: "In the Hobbs Act, 60 Stat. 420, carried forward as 18 U. S. C. § 1951, which amended the Anti-Racketeering Act, the exclusion clause involved in the *Local 807* decision was dropped. The legislative history makes clear that the new Act was meant to eliminate any grounds for future judicial conclusions that

Congress did not intend to cover the employer-employee relationship. The words were defined to avoid any misunderstanding."

In *Green*, the Court held that it was an extortion within the meaning of the Act to use force to obtain payment of wages for unwanted and superfluous services. *Id.*, at 417.

Here, the services were not unwanted or superfluous; they were services being negotiated under a collective-bargaining agreement.

The Court relies mostly on the legislative history of a measure covering the same topic which was passed by the previous House but on which the Senate did not act. Two years later, the bill in its present form was enacted. It was a differently constituted House that debated it and the year was 1945 rather than 1943. So the most relevant legislative history, in my view, concerns the 79th Congress, not the 78th.

The fear was expressed in the House that the elimination of the Exception Clause would open up the prospect of labor's being prosecuted.[1] As a consequence, Congressman Celler sought to amend the measure so as to exempt the use of violence to exact "wages paid by a bona fide employer to a bona fide employee."[2] His precise amendment in that regard would define "property" in the Act as not including "wages paid by a bona fide employer to a bona fide employee."[3] Those who objected said that it would substantially restore the 1934 Act.[4]

Congressman Biemiller, in speaking for the Celler Amendment said:

"We fear, for example, under the bill as it now

---

[1] 91 Cong. Rec. 11914 (remarks of Rep. Marcantonio).

[2] *Id.*, at 11913.

[3] *Ibid.*

[4] *Id.*, at 11914; 11914–11915; 11918.

stands, that a simple, unfortunate altercation on a picket line—and we all know that human beings are frail and when tempers are hot some trouble may develop—under such a situation you may send a man to jail for 20 years or fine him $10,000." [5]

The Celler Amendment was rejected.[6]

As I read the Congressional Record, Congressman Baldwin spoke for the consensus when he said:

"This bill would not have been presented to the House if organized labor had recognized law and order in striking and in establishing their rights, as they have a right to do. Everyone can remember the taxicab strike in the city of Baltimore, which does not pertain to this bill, where cabs were overthrown, bricks thrown through the windows endangering the lives of people, innocent victims. Those were the tactics of organized labor which you people support outright and which organized labor sanctioned. The leaders were locked up and put in jail for participating in those activities. Yet you stand here on the floor of this House and say they did not do it or they did not know anything about it.

"Mr. Chairman, labor has a right to strike, but when labor perpetrates that sort of thing, they are going far beyond the bounds of reason. Certainly, I do not take the position that labor has not the right to organize or to strike, but when they do so they should abide by the laws of the land and the laws of decency. If they had done that, we would not have this legislation before the House today." [7]

---

[5] *Id.*, at 11916.

[6] *Id.*, at 11917.

[7] *Id.*, at 11918.

Congressman Whittington voiced the same sentiments:

> "The pending bill will provide for punishing racketeers who rob or extort. There is no justification for labor unions opposing the bill as it constitutes no invasion of the legitimate rights of labor. Robbery and extortion by members of labor unions must be punished. Labor unions owe that much to the public. In demanding the protection of laws, labor unions should urge that those engaged in legitimate interstate commerce be protected from robbery and extortion." [8]

Congressman Celler offered another amendment which would give as a defense to a charge under the Hobbs Act that the employee "did not violate the provisions of the Norris-LaGuardia Act, the Clayton Act, or the Railway Labor Act, or the National Labor Relations Act." [9] But that amendment was also voted down; [10] the only provision of the Hobbs Act which touched on that problem was 18 U. S. C. § 1951 (c), which stated that this section "shall not be construed to repeal, modify or affect" those laws. References were made in the House debates to the trucking problem in New York, where farmers bringing their produce to market in trucks were held up and money was extorted "from the drivers in order that the shipments might enter the Holland Tunnel and be delivered to their respective destinations in New York." [11]

Congressman LaFollette offered an amendment which would keep the 1934 Act intact but would bar the use of violence by a person not a bona fide employee to obtain

---

[8] *Id.*, at 11913.
[9] *Id.*, at 11919.
[10] *Ibid.*
[11] *Id.*, at 11917.

property from a bona fide employer.[12] That, too, was defeated.[13]

In the present case, violence was used during the bargaining—five acts of violence involving the shooting and sabotage of the employer's transformers and the blowing up of a company transformer substation. The violence was used to obtain higher wages and other benefits for union members. The acts literally fit the definition of extortion used in the Hobbs Act, 18 U. S. C. § 1951. The term "extortion" means the use of violence to obtain "property" from another. § 1951 (b)(2). The crime is the use of "extortion" in furtherance of a plan to do anything in violation of the section. § 1951 (a). The prior exception covering those who seek "the payment of wages by a bona-fide employer to a bona-fide employee" was taken out of the Act by Congress. Hence, the use of violence to obtain higher wages is plainly a method of obtaining "property from another" within the meaning of § 1951 (b)(2).

---

[12] Id., at 11919. The proposed amendment read as follows:

"(a) The term 'the payment of wages by a bona fide employer to a bona fide employee' shall not be construed so as to include the payment of money or the transfer of a thing of value by a person to another when the latter shall use or attempt to use or threaten to use force or violence against the body or to the physical property (as distinguished from intangible property) of the former or against the body of anyone having the possession, custody, or control of the physical property of the former, in attempting to obtain or obtaining such payment or transfer.

"(b) The term 'the rights of a bona fide labor organization in lawfully carrying out the legitimate objects thereof, as such rights are expressed in existing statutes of the United States' shall not be construed so as to ignore, void, set aside, or nullify the definitions set out or the words used in or the plain meaning of subsection (a) hereof."

[13] Id., at 11922.

Seeking higher wages is certainly not unlawful. But using violence to obtain them seems plainly within the scope of "extortion" as used in the Act, just as is the use of violence to exact payment for no work or the use of violence to get a sham substitution for no work. The regime of violence, whatever its precise objective, is a common device of extortion and is condemned by the Act.

Congressman Lemke said in the House debates on the Hobbs Act, which he opposed, "The minority is generally right." [14]

Whatever may be thought of the policy which the Court today embroiders into the Act, it was the minority view in the House and clearly did not represent the consensus of the House. No light is thrown on the matter by the Senate, for it summarily approved the House version of the bill. [15]

It is easy in these insulated chambers to put an attractive gloss on an Act of Congress if five votes can be obtained. At times, the legislative history of a measure is so clouded or obscure that we must perforce give some meaning to vague words. [16] But where, as here, the consensus of the House is so clear, we should carry out its purpose no matter how distasteful or undesirable that policy may be to us, [17] unless of course the Act oversteps

---

[14] *Ibid.*

[15] 92 Cong. Rec. 7308.

[16] See, *e. g., Addison* v. *Holly Hill Co.,* 322 U. S. 607, 615–616, for the use by Congress of the rather opaque phrase "area of production."

[17] The fear was expressed in the House debates by opponents of the measure that a fistfight on a picket line during a strike could bring down on the offender a $10,000 fine and 20 years in jail or both. See 91 Cong. Rec. 11916; *supra,* at 414–415. And the Government actually argued in one case, *United States* v. *Caldes,* 457 F. 2d 74, 78, that a union and its members were guilty of extortion if they used the coercion of a strike to obtain economic benefits from the employer. That, however, is nonsense, as the court in *Caldes*

constitutional boundaries.  But none has been so hardy as even to suggest that.

While we said in *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 522, that it is "retrospective expansion of meaning which properly deserves the stigma of judicial legislation," the same is true of retrospective contraction of meaning.

I would reverse.

---

ruled, *id.,* at 79, for the Hobbs Act specifically does not touch collective bargaining of which the strike is a component part.  18 U. S. C. § 1951 (c).  Moreover, the court in *Caldes* held that "mischievous" conduct during a strike and actions which are "the by-product of frustration engendered by a prolonged, bona fide collective bargaining negotiation," *id.,* at 78, are often only low-level acts of violence that may be unfair labor practices or, at best, subject to state, not federal, prosecution.  That is my view.