UNITED STATES of America,

v.

Robert BAUDIN, Defendant.

No. 79 Cr. 0781–KTD.

United States District Court,
S. D. New York.

Feb. 4, 1980.

Robert B. Fiske, Jr., U. S. Atty., S. D. New York, New York City, for the United States of America; Carolyn H. Henneman, Peter J. Romatowski, Asst. U. S. Attys., New York City, of counsel.

Edward T. Chase, New York City, for defendant.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge:

The Grand Jury has charged the defendant, Robert Baudin, in a three count indictment, with extortion in obstructing inter-

state commerce in violation of 18 U.S.C. § 1951 (Count 1), the transportation in interstate commerce of threats to injure the persons (Count 2) and property (Count 3) of others in violation of 18 U.S.C. § 875(c) and (d).

The facts as alleged in the indictment and represented to this court by the parties are as follows.

In June 1978, the defendant executed a contract with the publishing house of Harcourt Brace Jovanovich, Inc. [hereinafter referred to as "HBJ"], covering the publication of defendant's auto-biographical work, "The Fake."

"The Fake", later retitled "Confessions of a Promiscuous Counterfeiter" by HBJ, was originally published in Australia and England by a publishing house unrelated to the instant proceedings. The contract with HBJ, however, granted HBJ the exclusive right to print, publish and market the book in the United States. Under its terms HBJ was apparently vested with broad, if not complete, discretion with respect to the printing, publication and distribution of the book. See Exhibit A to the Affidavit of Assistant United States Attorney Carolyn H. Henneman dated December 10, 1979.

As it developed, however, numerous disputes arose between defendant and HBJ over these precise points. In fact, defendant's major complaints with HBJ are its retitling of his book and the minimal editorial efforts expended by HBJ on the book.

As a result of his continuing controversy with HBJ over his book, defendant delivered a written statement, set forth in the margin, to the New York Post.[1] In addition to the grievances mentioned above, the statement made clear that defendant intended to conduct certain aerial activities in the vicinity of HBJ's New York offices and that once the defendant was airborne, the statement was to be delivered to HBJ. This apparently was done and the instant indictment resulted.

Defendant now moves pursuant to Fed.R. Crim.P. 12(b), to dismiss the entire indict-

ment on the ground that his alleged conduct, even if true, does not amount to extortion. He reasons that the "property" or "things of value" which he is accused of having attempted to obtain, were objects to which he had a genuine claim of right. Alternatively, defendant urges that Counts 1 and 3 are fatally defective on their face since they fail to charge that defendant had no claim of right to the property or thing of value which he allegedly attempted to extort.

Finally, defendant argues that Count 3 is fatally defective since his statement (the written statement to HBJ), fails as a matter of law to constitute a "threat to injure the person of another." 18 U.S.C. § 875(c). He bases this argument upon certain language in the statement which purports to disclaim any intention to injure HBJ's property or the lives of any individuals in the HBJ building.

For the following reasons these arguments must be rejected and the motion denied.

Count 1 of the indictment charges defendant with violating the Hobbs Act, 18 U.S.C. § 1951. In pertinent part, that Act provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"Extortion" is defined in the Act, as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. § 1951(b)(2).

Count 3 charges defendant with violating 18 U.S.C. § 875(d) which provides, in pertinent part:

(d) Whoever, with intent to extort from any person, firm, association, or cor-

---

1. Attached hereto as an Appendix is the unedited letter of the defendant.

poration, any money or other thing[s] of value, transmits in interstate commerce any communication containing any threat to injure the property or reputation of the addressee . . . shall be fined not more than $500 or imprisoned not more than two years, or both.

Counts 1 and 3 are attacked on the theory that "a defendant who engages in violent or fear-producing behavior, in pursuit of a legitimate, lawful objective, is not guilty of extortion under federal law." Defendant's Memorandum at 7. Defendant reasons that his demands, were perfectly legitimate editing, titling and promotion requests to which he was entitled under his agreement with HBJ. He concludes, therefore, that these requests are insufficient, as a matter of law, to support the extortion counts.

In support of his conclusion, the defendant relies exclusively upon the Supreme Court's decision in *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), and the Sixth Circuit's decision in *United States v. Yokley*, 542 F.2d 300 (6th Cir. 1976). This reliance is misplaced.

In *Enmons*, various union members and officials were charged with Hobbs Act violations. The indictment charged that during a strike by union employees for higher wages and other benefits, the defendants engaged in certain violent acts which were intended to coerce management to accede to the union's demands.

The sole issue presented to the court was indeed a narrow one:

> Whether the Hobbs Act proscribes violence committed during a lawful strike for the purpose of inducing an employer's agreement to legitimate collective bargaining demands.

*Id.* 410 U.S. at 399, 93 S.Ct. at 1009.

While noting that union violence during a strike would undoubtedly constitute a violation of state law, the court held that the Hobbs Act was not intended to encompass such occurrences. Paramount in the court's analysis, however, was the fact that despite the violence employed by the union, which was wrongful in and of itself, its objectives of higher wages and greater benefits were legitimate collective bargaining demands. Stated differently, the court concluded that before a Hobbs Act violation would lie, it must be demonstrated that the extortionist had no legitimate or lawful claim to the property he was attempting to obtain.

██ However, not every claim of right will preclude the prosecution of a would-be-extortionist under the Hobbs Act. Indeed, if this were the case, then a defendant would have only to assert some claim, however frivolous, to the property he had attempted to extort. Thus, logic dictates that it is only where the claim of right is manifest or beyond dispute, such as in *Enmons*, that a Hobbs Act violation must fall. Certainly no one would dispute a union's ability, apart from any violence, to seek wages and benefits for its members. I am presented with quite a different situation in the case at bar.

██ Here, defendant was attempting to coerce HBJ to re-edit and republish his book upon his terms. I assume that defendant bottoms his argument on the presumption that he was somehow entitled to this re-editing and republishing under the terms of his contract with HBJ. The agreement itself, however, will not support such a conclusion. To be sure, the contract vests HBJ with broad discretion with respect to the printing, publication and distribution of the book.

Even assuming that such a colorable claim of right could be gleaned from the agreement,[2] it is far from the manifest

---

2. This is indeed doubtful. The contract signed by the defendant identifies the work as "Confessions of a Promiscuous Counterfeiter." And yet, in the written statement submitted to the New York Post, which was later forwarded to HBJ, the defendant complains that HBJ retitled the book "against his wishes." Indeed, he demanded that the book be reissued within three months under a title acceptable to him.

It would appear that rather than obtaining things to which the defendant was entitled to, he attempted by his aerial activities to renegotiate his agreement with HBJ.

claim of right present in *Enmons* warranting a pretrial dismissal of the Hobbs count. At best, defendant can hope to achieve a post-trial dismissal of this count if the government should fail to prove that his attempt to extort property from HBJ was wrongful. *See United States v. Enmons, supra*, 410 U.S. at 400, 93 S.Ct. at 1009.

Suffice it to say, that given the indictment and the factual allegations contained therein, Counts 1 and 3 are sufficient to withstand the instant motion.

■ Defendant seeks dismissal of Count 2 on the grounds that his written statement expressly negates any intent to injure any person present in the HBJ building, and in any event the statement was nothing more than a result of a labor dispute between defendant and HBJ and as such was entitled to first amendment protections. Both arguments are meritless and must be rejected.

While it is true that in one portion of his written statement, the defendant states that

> Evacuation of the HBJ building would serve no useful purpose. Should I at any time during this flight find that my emotions make it difficult for me to safely control the airplane, I will give warning early enough for the evacuation to be carried out in an orderly manner.

The statement also provided, in pertinent part:

> When I think of the way I have been lied to by this firm and how they wasted three years of my work because it happened to suit their budget way of doing things, I must admit to thoughts of flying straight in through their executive suite window . . . ”

> In their wisdom (Harcourt, Brace management) might even come to the conclusion that if I do not get what I want, I just possibly might fly through the top man's office window in an attempt at a short field landing on his desk.

> Considering the past life of the perpetrator of this exercise, well known to those

in the company who had anything to do with the publication of my book, retaliation of this nature must seem in character.

Taken as a whole, the statement does not, as a matter of law, negative an intention by defendant to injure persons in the HBJ building during his aerial activities. Indeed, he threatened to fly into the "top man's office window in an attempt at a short field landing on his desk."

■ Defendant's first amendment argument is similarly insufficient to warrant dismissal of Count 2. The threat when viewed in conjunction with defendant's aerial activities was sufficiently "unequivocal, unconditional, immediate and specific as to the person[s] threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976).

The balance of defendant's arguments are insufficient to warrant dismissal of the indictment and must be rejected.

Accordingly, defendant's motion to dismiss Counts 1, 2 and 3 of the indictment are denied.

So ordered.

### APPENDIX

This aerial activity is directed against the publishers Harcourt, Br ace, Jovanovich—and should have been anticipated by them in view of their shabby treatment of author Robert Baudin.. Considering the past life of the perpretrator of this excercise, well known to those in the company who had anything to do with the publication of my book, retaliation of this nature must seem in character.

In a sense I have the approval of the company in carrying out what I am doing as one of their responsible officials told me to take whatever action I liked—after I took strong exception to their many broken promises. Somehow I feel that this individ-

ual was so lacking in imagination that he actually thought I would play the game according to their rules rather than come up with some twist of my own..

Doing it this way enables me to by-pass their expensive lawyers and time consuming courts—and elevate the dispute to a level of my own choosing. The sight of an airplane of unknown intent close outside the windows of top management must have far greater impact than any long drawn out legal action I might initiate.

My choice is to take the most drastic action possible, and in so doing hope that the glare of publicity bound to follow might benefit or at least encourage other authors who have been similarly 'ripped off', exploited, lied to and generally treated in a manner to nullify their months and years of work. After this performance certain publishers might be well advised to ascertain that authors they intend to screw are not capable of flying—and also that they lack the resources necessary to hire a pilot and aircraft to do the job for them.

The substance of my dis-agreement with Harcourt, Brace, Jovanovich is as follows. They undertook to publish and adequately promote a book of mine which had previously been published in Australia—and made the best seller lists. Despite expansive promises as to what their powerful publicity and promotion people would not before the (unintelligible) book accross with the public, they let me down on all counts.. Both before and after the contract for publication was signed I was given strong verbal assurances that as part of a 450 million dollar conglomerate the firm of Harcourt, Brace, Jovanovich was in a position to—and would—give the book massive nation wide promotion.

At this point I will mention the fact that I personally walked in off the street and sold the book to H.B.J.—after pulling it back from a New York publisher who clearly lacked the marketing and publicity resources to bring it to the notice of the American public. As an indication of H.B.J.'s attitude toward me once the contract had been signed I could mention that they

have never taken me to lunch—or even so much as bought me a 'Big Mac'.

Prior to its release the book, which they'd titled, 'Confessions of a Promiscuous Counterfieter' against my wishes, received good write ups in the trade journals 'Publishers' Weekly' and 'Krocus'—but no use of these was made in any promotion. The book had sufficient impact for a film producer to option for it before publication, but no attempt was made to use this for publicity value. As far as I can ascertain, the publishers did nothing more than to send out a number of copies to already inundated reviewers.

After publication date, by which time copies of the book had been quietly distributed to stores in major cities, I questioned the firm's gross failure to live up to its expansive promotional promises—only to be told that their budget did not run to this sort of expense. The small print run of 10,000 copies and lowering of production costs by deleting without my authorization much material, salacious and otherwise, forces me to the conclusion that the publishers promises were false from the beginning—and that they had no intention of running it as anything more than a 'budget quickie' to assist them in maintaining a high number of releases.

Minimal editorial time was spent in preparing the American release. Rather than work with the original manuscript I supplied their editor Brian Du Maine chose to use the Australian edition, which according to several expert opinions I obtained was rather poorly edited. The sum total of Du Maine's work amounted to little more than a 'chop job'. Editor Du Maine sent to me in Sydney Australia a galley proof for approval and correction—then ignored my corrections and suggestions to replace material that would make the story flow better. On my next visit to New York he showed me a copy of the American edition as 'fait accompli', and answered my protests over unauthorised cuts by saying that to stay within the budget he had to keep the number of pages down.

I have been advised that I have cause for legal action over the many unapproved changes in my book—but along with that advice came my lawyer's suggestion that I'd probably be collecting the old age pension before the matter was finally settled.

To make certain that I wasnt in any way being unfair to the publishers I checked a number of leading bookstores ranging from New York to San Francisco. Typical of the comments I received was, 'when we get a book that the publisher is obviously not behind, and is doing nothing to promote, we simply file it under whatever category it seems to fit and then sell it to anyone who might come in and ask for it. We do not give 'up front space' to books that come in that way.

When I think of the way I have been lied to by this firm, and how they wasted three years of my work because it happened to suit their budget way of doing things, I must admit to thoughts of flying straight in through their executive suite window. Such a finale would make these people realise how strongly I feel about the way they took me down—but as a sane and responsible pilot I am aware that I should not give in to this kind of thinking. It would be of inestimable value in re-affirming my awareness of pilot responsibility—and giving me the stimulus needed to fly this airplane away to a safe landing at an airport—if the officials of H.B.J. would accede to certain requests that I am about to make.

I merely state these as 'requests', but the top management of H.B.J. could well see them as demands. In their wisdom they might even come to the conclusion that if I do not get what I want I just possibly might fly through the top man's office window in an attempt at a short field landing on his desk.

I must stress the point that evacuation of the H.B.J. building would serve no useful purpose. Should I at any time during this flight find that my emotions make it difficult for me to safely control the airplane I will give warning early enough for the evacuation to be carried out in an orderly manner.

Before spelling out my 'requests' I would like to make very clear the fact that my position is not that of a disgruntled author whose work failed to make the grade with the public. It was never given a fair chance. Had the book been properly promoted, not given an unsuitable title against my wishes, not been cleaned up to the point where it could almost get the Legion of Decency's approval, and not been cut to where the story seems almost dis-jointed, I would have no cause to protest. If the book had failed after the sort of editing and promotion I was led to believe it would get I would accept such failure as the final judgement of the reading public—and happily go back to flying airplanes in a more normal manner than I am doing at present.

THE REQUESTS I MAKE ARE AS FOLLOWS.

1  The book presently in existence under the title 'Confessions of a Promiscuous Counterfieter' be re-issued within three months—under a title that ia acceptable to both me and a senior editor at H.B.J.

2  The book is to be re-edited by one of the company's more competent editors, working in close collaboration with me and using the original manuscript. Deletions will only be made by mutual consent, but in this I undertake not to be unreasonable. Disputes in this areas of the work will be arbitrated by a reputable editor from another publishing firm if such can be recruited, or by some responsible officer or member of the Authors' Guild.

3  In the event of another major publishing firm offering to take over publication and promotion of the book under their own imprint, I alone will have the final decision as to acceptance or rejection of such offer. If no such offer avails, H.B.J. will re-issue the book as per provisions 1 and 2 above—and give it what would be considered an adequate promotion by reputable consultants within the publishing industry.

NOTE. In this context I make specific mention of the fact that editor Brian

Du Maine on two occasions offered to give me the book back subsequent to publication—after I'd criticised the quality of his production and protested at company's failure to promote same. These offers were clearly an expression of the company's willingness to release me from my contractual obligations, at a time when the work had been cheapened by their ineptitude.

4 No paperback sales are to be finalised before the new edition is ready for release, and any pending negotiations will be suspended. In the unlikely event of a paperback sale having already been made the company will re-negotiate on the basis of a better product to be soon available. If it is a sale unsatisfactory to me, H.B.J. will get out of it the best way they can.

5 Foreign sales are to be based on the re-released version of the book with the exception of the Republic of South Africa. The government of that country has already banned the Australian edition, but might be inclined to approve the weakened American first version. South Africa might be a good place to dump remaining copies of the presently existing book.

6 None of the above is to be construed as in any way effecting existing arrangements between motion picture producer Sam Le Frac of New York, myself and H.B.J. for a film version of the work.

7 Harcourt, Brace, Jovanovich will take me to lunch, as I am informed that this is customary in the business of publishing. Since I am easily pleased and not addicted to fancy food or service, the nearest Mac Donald's will suffice for this purpose.