UNITED STATES of America,
Plaintiff-Appellee,

v.

Harlan DUHON and Donald Ray Lovett,
Defendants-Appellants.

No. 76–3998.

United States Court of Appeals,
Fifth Circuit.

Jan. 3, 1978.

Rehearing Denied Jan. 30, 1978.

James A. McPherson, New Orleans, La., for Lovett.

L. Edwin Greer, Shreveport, La., for Duhon.

Edward L. Shaheen, U. S. Atty., D. H. Perkins, Jr., Asst. U. S. Atty., Donald E. Walter, Sp. Asst. U. S. Atty., Shreveport, La., for plaintiff-appellee.

Before WISDOM, GEWIN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Defendants Harlan Duhon and Donald Lovett appeal from convictions for extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. The charge of extortion arose out of a $5,000 payment allegedly made to the defendants, two labor union officials, by a building contractor who was experiencing labor troubles at his construction site.

On appeal defendants present a number of assignments of error. Both Duhon and Lovett urge that: 1) the evidence presented at trial is insufficient to support a conviction for extortion; 2) the admission of evidence regarding previous labor troubles of the building contractor was prejudicial error; 3) the court's refusal to admit the testimony of a defense witness was erroneous as the witness's testimony would have rebutted the Government's impeachment of a defense witness. Defendant Duhon asserts that: 4) the cross-examination of a defense character witness as to a criminal charge against Duhon subsequent to the offense charged in the present case was improper and prejudicial. Defendant Lovett avers that: 5) the trial court erroneously prohibited the use in cross-examination of the FBI summaries of statements of two prosecution witnesses; 6) the denial of recross-examination of prosecution witness Buckholtz about his hearing problem was error; 7) the trial court's charge to the jury regarding the legality of the picketing at the construction site was irrelevant and prejudicial; 8) the prosecutor's jury argument constituted grounds for mistrial, and 9) the indictment charged an extortion of Buckholtz but the evidence could at most be construed as an extortion of West Brothers, the future owners of the warehouse. Finding all nine contentions without merit, we affirm.

*Facts*

As the circumstances of the alleged $5,000 payment to Duhon and Lovett are of crucial importance in this case, a detailed description of the facts is required. The prosecution's main witness was Eugene Buckholtz, president of Southwest Construction and Paving, Inc. In 1974 his company began construction of a warehouse for West Brothers stores in DeRidder, Louisiana. The project involved some nonunion workers, including a nonunion electrical contractor. Soon after work began on the construction site, pickets from the Southwest Louisiana Building and Construction Trades Council appeared and some of the workers on the site walked off.

Buckholtz stated at trial that at this point he did not know why the pickets had been placed on the job site, and that Jim Barr, president of the local union, did not tell him the reason for the picketing. Buckholtz testified that he was especially worried about the picketing because of the large amount of construction materials scheduled to arrive at the site. In addition to this concern, Buckholtz testified as to a previous experience with labor trouble on a construction site in 1964, when he suffered the destruction of valuable equipment. Edward Brandt of West Brothers stated that delay in construction was particularly worrisome to him because carloads of merchandise were scheduled to be delivered to the warehouse around the anticipated completion date. Brandt and Buckholtz discussed what to do to stop the picketing. Brandt asked Buckholtz if he thought $10,000 would suffice, and Buckholtz replied that $5,000 should be enough.

Barr, the union local leader, set up a meeting to discuss the picketing. On July 16, 1974, a meeting was held between the local labor leaders, Lovett, Duhon, Barr, and Carlock, and the representatives of management, Buckholtz and Brandt. Herman Stewart, the city attorney, was also present. After the meeting proceeded for several minutes it became apparent that group discussion would be fruitless. Buckholtz's inquiries into why the pickets were

on his site were answered by Lovett with the statement that the site was "not right." Brandt testified that when he sought a more responsive answer, Lovett replied to the effect that the picketing might expand to include West Brothers' retail stores. Stewart testified that although he might have received the impression that the stores could possibly be picketed, he could not say that a direct statement was made. Stewart remarked that the meeting was going nowhere. Lovett responded that Buckholtz knows what it will take. Stewart then suggested that Buckholtz and Lovett take a walk.

Buckholtz testified that Lovett's tone changed dramatically once they left the meeting. According to Buckholtz, Lovett told him that the "whole thing could be resolved real easy," and put his arm around Buckholtz, who then asked him if $5,000 would take care of it. Lovett responded that everything should be all right and that he wanted Buckholtz to sign a labor contract with him. Buckholtz stated that he told Lovett he did not want to sign the contract because of his nonunion maintenance workers at the paper mill. Lovett said that the contract only concerned the workers at the warehouse construction site. Some further discussion of employee positions at the construction site followed, and then Lovett and Buckholtz returned to the meeting. They told the other representatives at the meeting that their differences had been settled and the pickets would be withdrawn. The pickets were removed in the afternoon and never reappeared. Neither the $5,000 payoff nor the labor contract was mentioned at the meeting, and Buckholtz did not inform Brandt that he had signed a labor agreement with Lovett.

After the meeting Buckholtz told Brandt that he had agreed to pay $5,000. Later that afternoon Buckholtz received a check from West Brothers made out to his company. Buckholtz cashed the check the next day, receiving payment in fifty $100 bills. Buckholtz purchased a hunting camp soon after cashing the West Brothers check, paying for it with $3,500 in cash and two checks. Buckholtz testified that the $3,500

in cash had been accumulated over a few months by writing checks in excess of the amount owed at the grocery store and cashing rental checks from a bowling alley he owned. Buckholtz' wife testified that the $3,500 in cash was mainly $100 bills.

According to Buckholtz, Duhon called him in late July or early August regarding the electrical contractor at the warehouse construction site. Duhon claimed that the contractor had not seen him and become "right." Buckholtz told Duhon to see Lovett. The record indicates that there were four phone calls involving Buckholtz and the Lake Charles Electrical Workers Local, of which Duhon was president: on July 23, two on July 26, and one on August 19, 1974.

Buckholtz claimed that Lovett called him on August 19 and asked him to come to Lake Charles. Buckholtz refused at first, claiming he was too busy. Buckholtz then phoned Brandt and told him he had to deliver the money. After speaking with Brandt, Buckholtz called Lovett back and said he would go to Lake Charles that afternoon.

When Buckholtz arrived in Lake Charles he found Lovett and Duhon together. The three men then went for a ride in Duhon's car. During the ride, Lovett asked whether Buckholtz had brought it. Buckholtz removed the money from his pocket and remarked that he did not know how the payment was expected, and that he had placed the money in five envelopes, expecting that five different trades were going to be bought off. Lovett replied to the effect that no such division was contemplated, and that they would take care of the money. Buckholtz said Duhon had mentioned the problem of the electrical contractor and after the payment Duhon declared that everything was fine, and that the electrical contractor was "okay." Buckholtz considered the payment to have been made to both Lovett and Duhon.

Buckholtz stated that Duhon's car was having transmission trouble on August 19, 1974. The day after Buckholtz's trip to Lake Charles, Duhon's car was taken to a

garage for repairs. The mechanic who repaired Duhon's car, Albert Young, testified that the vehicle had been running hot and only preventive maintenance was performed on the transmission. The Government sought to impeach Young's testimony by calling an FBI agent who stated that Young had previously told him that the problem had concerned the transmission's failure to shift correctly.

A. K. Newlin, the electrical contractor, testified that after the construction work had been proceeding for some time after the August 19 payoff, Buckholtz phoned him and said Duhon was complaining that Newlin had not succeeded in getting "right" with him.

### 1. Sufficiency of the Evidence

■ The jury obviously resolved the issue of credibility in favor of Mr. Buckholtz. On review we must determine whether the circumstances make belief of Buckholtz's version of the $5,000 payment unreasonable, and whether if Buckholtz's testimony is completely accepted a case of extortion has been proved beyond a reasonable doubt. Of course, the evidence must be reviewed in the light most favorable to the Government. *See Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Martinez*, 5 Cir., 1977, 555 F.2d 1248. We will first examine the alleged inconsistencies urged by the defendants as rebutting the credibility of Buckholtz's testimony.

■ Defendants' contention that the failure of Lovett and Duhon explicitly to request money at any point is inconsistent with Buckholtz's explanation of the payoff. This contention is without merit because the circumstances surrounding both the initial conversation between Lovett and Buckholtz and the later automobile ride including Duhon were such that ambiguous remarks can quite easily be understood as requests for money. In any case, this question was one for jury resolution, and we cannot conclude that its verdict was unwarranted under the circumstances. Defendants also point to Buckholtz's failure to inform anyone that he signed a labor agreement with Lovett and his failure to come forward with the charge of extortion for nineteen months. These facts are best explained in terms of Buckholtz's protection of his own interests. Defendants have also suggested that Lovett's acceptance of only a $5,000 offer is unrealistic, as a seasoned labor negotiator attempting to extort would certainly bargain for more money. Defendants seek to buttress this view with the fact that Lovett did not set a time and place for payment at the time the $5,000 was offered by Buckholtz. This fact proves nothing conclusive, however, because both Buckholtz and Lovett must have known that if Buckholtz attempted to renege on his offer, Lovett could simply reimpose a picket line. Another fact urged by defendants as inconsistent with Buckholtz's testimony is the payment, predominantly in $100 bills, of $3,500 for the purchase of a camp soon after Buckholtz cashed the $5,000 check from West Brothers and received the sum in fifty $100 bills. The jury evidently believed either Buckholtz's explanation or that even if Buckholtz had used $3,500 of the $5,000 in late July, the $5,000 was nonetheless paid over to Lovett and Duhon on August 19.

The question now is whether the evidence offered by the Government is sufficient to prove extortion within the meaning of the Hobbs Act. The statute, 18 U.S.C. § 1951, provides:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, . . shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

. . . . .

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

■ Buckholtz's testimony establishes that money had been obtained from him by Lovett and Duhon with his consent. However, the evidence regarding Buckholtz's state of mind during the period before the offer of $5,000 was made shows that he was motivated by fear of economic loss caused by the picketing. In addition, his previous experience with labor unrest in 1964 was shown to have resulted in some destruction of Buckholtz's property. The anticipation of economic loss constitutes "fear" within the meaning of the Hobbs Act. *See, e. g., United States v. Quinn*, 5 Cir., 1975, 514 F.2d 1250, 1267, *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976); *United States v. Jacobs*, 5 Cir., 1971, 451 F.2d 530, 542, *cert. denied*, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

■ The crucial issue is whether defendants intended to induce the $5,000 payment by exploiting Buckholtz's fear of economic loss. If not, then defendants merely accepted a bribe, which does not constitute extortion or violate the Hobbs Act. The distinction between extortion and bribery was discussed in *United States v. Hyde*, 5 Cir., 1971, 448 F.2d 815, 833, *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972): "[t]he distinction from bribery is therefore the initiative and purpose on the part of the [defendant] and the fear and lack of voluntariness on the part of the victim." Thus, the defendant must intend to exploit the fear of the victim. The defendant need not have originally caused the fear, nor need the cause of the fear itself be wrongful. *See id.*

■ In the present case there is sufficient evidence to demonstrate both the existence of a reasonable fear on the part of the victims and the requisite intent to exploit that fear. Buckholtz and Brandt realized that the picketing would cause them serious economic harm if it continued. The fact that Buckholtz and Brandt had agreed between themselves before the July 26

meeting with the labor representatives to offer the union leaders $5,000 to remove the pickets does not preclude a finding that Lovett and Duhon intended to obtain money from Buckholtz and Brandt by exploiting their fear. The extortionist need not explicitly demand property before it is offered. The jury could reasonably find that Buckholtz and Brandt realized that they were being set up by unscrupulous labor leaders and were simply planning for an inevitable demand for money.[1] The uncompromising stance taken by Lovett at the July 16 meeting in DeRidder, including the veiled suggestion that picketing could expand to include West Brothers' retail outlets, is further evidence of defendants' intent to intimidate Buckholtz and Brandt. The jury reasonably concluded that the threat of continued and perhaps expanded picketing absent a payoff was implicit in the actions of Lovett and Duhon, and that the lack of an explicit threat or request for money was not inconsistent with a finding that Lovett and Duhon fully intended to exploit the vulnerability of Buckholtz and Brandt to the possibility of continued picketing.

■ This court has previously affirmed convictions for extortion where the defendant claims that the evidence only shows receipt of a bribe. *See, e. g., United States v. Quinn*, 5 Cir., 1975, 514 F.2d 1250, *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976); *United States v. Hyde*, 5 Cir., 1971, 448 F.2d 815, *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745. In *Quinn* the court emphasized that "it is not necessary that the government prove that the fear was a consequence of a direct threat," 514 F.2d at 1266. The court in *Hyde* also noted that explicit threats were not required, and that the intent to extort could be inferred from the state of mind of the victim: " '[t]he jury is permitted to find such inducement by the use of fear from testimony as to the state of mind

---

1. *See United States v. Hyde*, 5 Cir., 1971, 448 F.2d 815, 834, *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972): "[t]he jury could infer that these people knew of the general pattern of extortion and sought out Hyde with the knowledge that they would have to deal with him eventually . . . ."

of the victim . . . .' (*quoting United States v. Tolub,* 2 Cir., 1962, 309 F.2d 286, 289). The victim's fearful state of mind is a crucial element in proving extortion." 448 F.2d at 845. The avoidance of explicit demands for personal payoffs and threats of adverse consequences if the payment is not made cannot in themselves save a defendant from a jury determination that he intended to extort. In proving the crime of extortion, where intent often must be inferred from ambiguous statements and situations, the jury's verdict must be accorded substantial weight.

■■■ Defendant Duhon contends that even if a case of extortion has been proved against Lovett, the evidence is insufficient to identify him with Lovett's extortion scheme. Duhon was present at the July 16 meeting, where he voiced his dissatisfaction with Buckholtz's nonunion electrical contractor. Buckholtz testified that Duhon called him regarding the electrical contractor in late July or early August and complained that the subcontractor had not come by to see him and become "right." Buckholtz referred Duhon to Lovett. In addition, it was shown that three phone calls to Buckholtz had been made from Duhon's union local office, including one on August 19, the date of the payoff. Duhon remembered phoning Buckholtz on August 19, but could not recall talking to him. Duhon explained that the August 19 call was made at Lovett's request. Even more telling evidence of Duhon's guilt was his assurance to Buckholtz after payment of the $5,000 to Lovett that everything was fine with the nonunion electrical contractor. The only evidence that might possibly suggest that Duhon was not a party to Lovett's extortion is the testimony of the electrical contractor, A. K. Newlin, a government witness, indicating that months after the August 19 payment Duhon once again complained that the electrical contractor had not yet become "right" with him. But this testimony is inconclusive, as Duhon could have misled Buckholtz on August 19, or changed his mind since that time. Taken as a whole there was sufficient evidence to support the jury's conclusion that Duhon

was involved with Lovett in the extortion of Buckholtz.

## 2. Evidence of Previous Labor Conflict

Evidence of Buckholtz's experiences with labor unrest on a construction site in 1964 involving some destruction of equipment was admitted at trial. Defendants contend that the admission of this evidence was improper, inflammatory and prejudicial. The evidence was offered for the purpose of buttressing the prosecution's claim that Buckholtz was in reasonable fear of economic losses as a result of the picketing, and the trial court instructed the jury that the evidence was to be considered solely for its value in illustrating the fearful state of mind of Buckholtz. Defendants insist that admission of evidence of vandalism in an organizational struggle that did not involve extortion ran afoul of this court's decision in *United States v. Broadway,* 5 Cir., 1973, 477 F.2d 991.

In *Broadway* a panel of this court considered the admission of other wrongful conduct of a defendant. The evidence was admitted for the purpose of showing the defendant's intent in the case before the court. Because the other wrongful conduct did not "include the essential physical elements of the offense charged," *id.* at 995, it was not "similar" conduct, and therefore inadmissible. *Broadway's* holding was interpreted in *United States v. Bryant,* 5 Cir., 490 F.2d 1372, *cert. denied,* 419 U.S. 832, 95 S.Ct. 629, 42 L.Ed.2d 58 (1974), where the similarity requirement was explained as a matter of relevancy and of degree. The *Bryant* court quoted with approval from *United States v. Kasouris,* 5 Cir., 1973, 474 F.2d 689, 692 that " '[t]here is no necessity for synonymity but there must be substantial relevancy for purposes other than to show the probability that the person committed the offense being tried because he is a man of criminal character.' " *Id.* at 1377.

■■■ Considering this explanation for the similarity requirement, it is apparent

that the defendants' claim is without merit. The prior acts of vandalism against Buckholtz were not introduced to show the defendants' criminal character. The acts of vandalism were not committed by the defendants and were not admitted to demonstrate their intent. We cannot say that the evidence had the effect of impugning the character and intentions of the two defendants. The relevance of the evidence is clear, as this court has recognized the value of evidence of the state of mind of the victims of extortion. *See, e. g., United States v. Hyde,* 5 Cir., 1971, 448 F.2d 815, 845, *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). Evidence of conduct of persons other than a defendant that is relevant to an alleged extortion victim's fearful state of mind is admissible regardless of its degree of similarity to the situation that gave rise to the alleged extortion.

### 3. *Refusal to Allow Testimony Regarding the Condition of Duhon's Automobile*

Buckholtz's testimony that Duhon's car had transmission trouble on August 19 was admitted to show that Buckholtz had been a passenger in Duhon's car. The Government called Albert Young, the mechanic who repaired Duhon's car on August 20, 1974, apparently to confirm Buckholtz's testimony regarding Duhon's transmission. Young testified that he had not noticed any problems with Duhon's transmission and that the replacement of the transmission filter and oil was merely preventive maintenance. The Government impeached Young's testimony by calling an FBI agent who stated that Young had told him that on August 20, 1974, Duhon's car would not shift correctly. ■ Defendants then offered the testimony of C. A. Nicholson, who purportedly examined Duhon's transmission nine months later when Duhon sought to sell the car. The claim is that Nicholson would have testified that a transmission problem was just emerging in May 1975. This testimony was offered to contradict the prosecution's evidence indicating transmission troubles in August 1974. The trial court sustained the Government's objection to Nicholson's testimony because it viewed the evidence as more misleading than helpful, noting that Duhon's car had been repaired twice since August 19, and that too much time had elapsed for the condition in May 1975 to be relevant to a determination of the condition in August 1974. The trial court has wide discretion in determining the relevancy of evidence, *see United States v. Linetsky,* 5 Cir., 1976, 533 F.2d 192, 204; *United States v. Allison,* 5 Cir., 1973, 474 F.2d 286, 288–89, *cert. denied,* 419 U.S. 851, 95 S.Ct. 91, 42 L.Ed.2d 82 (1974). We do not find an abuse of discretion in this case.

### 4. *Cross-Examination of a Defense Character Witness as to Other Charges Brought Against Defendant After the Events in the Present Case*

Defendant Duhon contends that the trial court erred in ruling in favor of the propriety of cross-examination of his character witnesses regarding Duhon's arrest and indictment on an independent charge subsequent to the events in the present case. Apparently as a result of this in chambers ruling, Duhon failed to call the character witnesses.

■ Duhon relies on *United States v. Lewis,* 1973, 157 U.S.App.D.C. 43, 482 F.2d 632, for the proposition that cross-examination concerning subsequent arrests and indictments of character witnesses who were to testify as to the peaceful and law-abiding character of the accused is, as a general rule, impermissible. The *Lewis* court recognized that cross-examination on such subjects was basically within the trial court's discretion. *See id.,* 157 U.S.App.D.C. 53, 482 F.2d at 642.[2] This court has recently indicated its approval of the general rule

---

**2.** The Supreme Court in *Michelson v. United States,* 335 U.S. 469, 480, 69 S.Ct. 213, 220, 69 S.Ct. 213, 93 L.Ed. 168 (1948), remarked on the

discretion vested in the trial court in controlling the cross-examination of witnesses.

espoused by Lewis.[3] Regardless of the proper rule for the admissibility of this evidence, the proof of Duhon's guilt was so convincing that any error must have been harmless. *See Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1942); *United States v. Lewis*, 1973, 157 U.S.App.D.C. 43, 482 F.2d 632, 646–47.

5. *Admissibility of Unsigned, Unadopted Statements of Prosecution Witnesses for the Purpose of Impeaching Their Testimony*

◼ Defendant Lovett complains of prejudice caused by the trial court's refusal to allow cross-examination of Buckholtz on the basis of summaries of the statements of prosecution witnesses Buckholtz and Brandt to the FBI. Lovett insists that these unsigned and unadopted summaries compiled by the FBI revealed prior inconsistent statements of the witnesses. The asserted inconsistency involved the date (August 19 or 20) of Buckholtz's trip to Lake Charles to deliver the payoff money. Lovett later examined the FBI agent and cross-examined Buckholtz on the inconsistency in dates. Thus, the issue of the inconsistent dates was fully aired before the jury. It is inconceivable that any prejudice could have resulted from the trial court's insistence on not using these unadopted statements as a basis for cross-examination.

6. *Denial of Recross-Examination of Buckholtz Regarding His Hearing Problem*

◼ On redirect examination of Buckholtz, the prosecutor asked him if he sometimes had difficulty hearing questions, and Buckholtz answered affirmatively. No further information regarding Buckholtz's hearing problem was presented by the prosecution. On recross-examination Lovett sought to question Buckholtz about this issue, but was prevented by the trial court on the ground that it was not a matter touched on in the original cross-examination. Defendant should not be precluded from re-cross-examining a witness regarding a matter not broached until redirect examination. In this case, however, the error was harmless beyond a reasonable doubt.

7. *Jury Instruction Regarding the Legality of the Picketing at the Construction Site*

◼ Lovett advances the argument that the trial court's instruction to the jury on the legality of informational picketing and the illegality of organizational picketing under certain circumstances was prejudicial error. The asserted bases for prejudice are: 1) that it improperly impugned the credibility of defendants by informing the jury that defendants' knowledge of the legality of the picketing was a fact issue for the jury, and 2) the possibility that the picketing was illegal could impermissibly be taken by the jury as evidence of coercive intent on the part of defendants. Neither of these assertions is correct. Defendants' knowledge of the legal status of the picketing was relevant to explaining their conduct and state of mind as to the entire labor relations situation at the construction site. The court's instruction that the jury was to decide whether union representatives knew the legal status of the picketing was no more than an admonition that the judge was not usurping the jury's role of determining the defendants' state of mind, and should not be taken as indirectly impeaching the defendants. The court's instruction was therefore not erroneous.

8. *Jury Argument*

◼ Lovett claims that the prosecutor in effect stated that a verdict of not guilty would undermine law enforcement efforts in the future because it would discourage victims of extortion from coming forward as witnesses, and that this constituted prejudice. Examination of the prosecutor's remarks reveals that the defendant's claim is

---

**3.** *See United States v. Candelaria-Gonzalez*, 5 Cir., 1977, 547 F.2d 291, 294 n. 5.

unwarranted.[4] The prosecutor's remarks were relatively mild and not prejudicial.[5] He merely noted the cost to Buckholtz's reputation in order to emphasize the credibility of the crucial government witness.

### 9. Variance of Evidence from the Indictment

The indictment charged defendants with taking money from Buckholtz by extortion. Lovett argues that the evidence at most demonstrated that the $5,000 was extorted from West Brothers rather than Buckholtz. This contention is without merit, as Buckholtz was the person who was negotiating with Lovett when the extortion demand was made, and the person who delivered the $5,000 to Lovett and Duhon. There has been no suggestion that Lovett and Duhon knew that West Brothers had given Buckholtz a check to cover the $5,000 payment. Therefore, the evidence proved an extortion of Buckholtz, as charged in the indictment.

AFFIRMED.

---

**4.** The prosecutor's concluding remarks were: You know, we wonder, we wonder why no one will come forward as a witness. There is the reason. You think he won't pay a price. Wait until his next construction in DeRidder. You think he hasn't paid a price? He is a witness, a man who got money taken from him and he is called a thief. Oh, no, Ladies and Gentlemen, you can't have it both ways. Either Gene Buckholtz is an honest man who came forward and told the truth and fulfilled his duty as a citizen and was a witness and these men are guilty as charged, or he is the thief and the crook and the con man they paint him to be. And I submit to you that would be the height, that would be the ruination of an innocent life.

**5.** See United States v. Millet, 5 Cir., 1977, 559 F.2d 253, 258 (finding prosecutor's closing remarks to have had only an "insubstantial and insignificant impact").