**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Edgar JONES, Mose Meade, German Stumbo, Kenneth Rowland and Teddy Kinney, Defendants-Appellants.**

**Nos. 84–5474, 84–5511, 84–5523, 84–5524 and 84–5525.**

United States Court of Appeals, Sixth Circuit.

Argued May 1, 1985.

Decided July 11, 1985.

Aubrey B. Harwell, Jr. (LEAD), Albert F. Moore, Neal & Harwell, Nashville, Tenn., Jerry A. Patton, Prestonsburg, Ky., for Edgar Jones.

Louis DeFalaise, U.S. Atty., Lexington, Ky., Thomas L. Self (LEAD), Charles Dause, Robert Erickson (argued), U.S. Dept. of Justice, Crim. Appellate Section, Washington, D.C., for the U.S.

Edwin J. Walbourn, III (argued), Ashland, Ky., for Mose Meade.

William D. Kirkland, McBrayer, McGinnis, Leslie and Kirkland, Frankfort, Ky., for Kenneth Rowland, Teddy Kinney and German Stumbo.

* Honorable William H. Timbers, United States Court of Appeals, Second Circuit, sitting by designation.

Before ENGEL and MARTIN, Circuit Judges; and TIMBERS, Senior Circuit Judge.*

TIMBERS, Senior Circuit Judge.

Edgar Jones, Mose Meade, German Stumbo, Kenneth Rowland and Teddy Kinney appeal from judgments of conviction entered May 29, 1984 in the Eastern District of Kentucky, G. Wix Unthank, District Judge.

All appellants were convicted after a jury trial of one count of conspiracy to obstruct interstate commerce by force and violence and of one count of extortion resulting in such obstruction, in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982) (the Act). The extortion conviction arose from the bombing of mining equipment belonging to the Ray-Mac Coal Co. (Ray-Mac), a competitor of Jones. Stumbo also was convicted of destruction of property by use of explosives, in violation of 18 U.S.C. § 844(i) (1982). Meade also was convicted of a second count of extortion, in violation of 18 U.S.C. § 1951, arising from the destruction of a coal tipple by arson.

All appellants were sentenced to consecutive terms of three years imprisonment on the conspiracy and the first extortion count; the court ordered, as to all appellants, that the sentences on the extortion count be suspended and appellants be placed on probation for two years. In addition, Meade and Stumbo were sentenced to consecutive terms of imprisonment of three years and eighteen months, respectively, on their additional convictions of destruction of property and extortion, respectively; the court ordered that the additional sentences imposed on Meade and Stumbo be suspended and that they be placed on probation for a period of two years. In short, the net sentence of imprisonment imposed on each appellant was three years. All appellants are free on bond pending appeal.

## I.

We summarize only those facts believed necessary to an understanding of our rulings on the legal issues raised on this appeal.

Jones was the part owner and president of the JRM Coal Co. (JRM), a company that marketed coal that was mined by a group of contract mine operators. Stumbo was one of these operators, as were accomplices Phillip and Pearl Booth, who entered into plea agreements in return for their testimony at trial. All of the operators in JRM's network had labor contracts with the United Mine Workers of America (UMWA).

In early 1982, JRM had a long-term contract to sell coal to South Carolina Electric and Gas Co. (South Carolina Electric). A force majeure clause in the contract relieved JRM of its obligation, in the event of a labor dispute or strike, to provide 7500 tons of coal per week. In mid-February 1982, JRM faced a depletion of coal available for shipment. Jones became concerned that Ray-Mac, a non-union operator, would take advantage of JRM's shortage and attempt to sell to South Carolina Electric at reduced prices. Jones enlisted UMWA local officials, including appellant Kinney, to stage a strike that would shut down Ray-Mac by preventing access to Ray-Mac's mine. The strike at JRM's affiliated mines also would allow JRM to invoke the force majeure clause and prevent non-compliance with the terms of its contract with South Carolina Electric.

JRM agreed during the strike to pay the wages of the miners employed by the contract mine operators. Booth and the other JRM affiliates told their miners to go on strike, explaining that it was necessary to protect the contract and preserve their jobs. The miners went on strike. A representative of the district office of the UMWA arrived and told the miners to return to work because the strike was illegal, but the miners remained off the job.

JRM financed the purchase of a large number of weapons by the Booths, who then provided the weapons to the strikers. Jones provided a case of whiskey to keep the strikers "fired up". The strikers set up picket lines in front of Ray-Mac's mine to prevent the non-union workers from reporting to work. Ray-Mac then organized an armed convoy to transport its workers safely past the picket line. On February 16, 1982, as the convoy attempted to enter the mine, one of the strikers produced a pistol and fired at the driver of the first truck. The driver was not injured. Other strikers began firing at the convoy and fire was returned from armed escorts of the convoy. Phillip Booth and another striker were injured.

During the next two days, Stumbo, Rowland and Kinney went into the hills overlooking the Ray-Mac site. From this vantage point, they were able to shoot at Ray-Mac equipment with the intent of disabling it. This tactic proved ineffectual. It was decided that, to put Ray-Mac out of business, they would have to blow up Ray-Mac's equipment. Jones enlisted Stumbo and another, Panhandle Moore, also known as the "timber rats", to destroy equipment with the use of explosives. The two men filled an inner tube and a basketball with dynamite and attached fuses. The basketball was attached to a bulldozer. The inner tube was placed on a mining auger. The basketball failed to explode, but the auger was heavily damaged by the dynamite in the inner tube.

In mid-February 1982, Ray-Mac's affiliated company, Coal-Mac Sales, Inc., leased a tipple for use at the Ray-Mac site. Jones was concerned that the tipple would allow Ray-Mac to save two dollars a ton on trucking costs. Panhandle Moore was enlisted, along with Meade and another, to burn the tipple. This operation was carried out successfully.

## II.

On appeal, appellants urge what we believe to be two principal claims of error.

First, they argue that the district court erred in denying their motion, made while the trial was in progress, for an evidentiary hearing to determine whether there was

prejudicial impropriety in the swearing, by the grand jury foreman, of a federal investigative agent as an "agent of the grand jury". With respect to this claim, appellants also argue that the court erred in denying their motion to dismiss the indictment.

Second, appellants challenge the court's jury charge on their *Enmons* defense. *United States v. Enmons*, 410 U.S. 396 (1973).

While other subordinate claims of error are raised, we shall devote this opinion, as counsel did at oral argument before us, chiefly to the two principal claims of error stated above.

### (A) *Swearing of Agent McAllister as an "Agent of the Grand Jury".*

Dennis McAllister, an agent of the United States Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, was the "case agent" who supervised the investigation of the events that led to the indictment and conviction of appellants. McAllister first became involved in the investigation on February 21, 1982 in response to a report on the bombing of the coal auger at the Ray-Mac site. It was he who discovered the unexploded bomb that had been attached to the bulldozer at the site. From that day forward, McAllister led the investigation and coordinated the use of undercover agents who infiltrated the group of striking miners believed responsible for the violence.

On October 4, 1982, McAllister appeared before the grand jury that had been convened in the case. McAllister testified as to his involvement in the investigation and presented the grand jury with an overview of the case. At the conclusion of McAllister's testimony, the government's attorney stated:

> "Mr. Foreman, one further thing, because of the records of this Grand Jury, a lot of records have been obtained; I'd ask you, if you would, to make Mr. McAllister an agent of this Grand Jury for the purpose of retention of the physical documents in the course of this investigation, and for the purpose of obtaining voluntary compliance with subpoenas."

The record reflects that McAllister then was sworn as an "Agent of the Grand Jury to assist in this Grand Jury's investigation, and retention of records".

Appellants contend that these facts were unknown to them until February 7, 1984, during McAllister's testimony at trial. At that time the prosecutor sought to use McAllister's status as "agent of the grand jury" for the purpose of establishing the chain of custody of, and thereby authenticating, certain exhibits that had been produced before the grand jury. On February 20, 1984, some two weeks later but before the close of the government's case, Jones moved to dismiss the indictment for prosecutorial misconduct, alleging several grounds for such dismissal.[1] Among them was the allegation that "the defendant believes that the Government has violated the grand jury secrecy requirements of Rule 6(e) of the Federal Rules of Criminal Procedure by having Special Agent Dennis McCallister [sic] appointed as an 'agent' of the grand jury." In his supporting memorandum of law in the district court, counsel for Jones

---

1. In support of this motion, appellants argued in the district court, and again before us, that the government failed to release at the proper time certain tape recordings that contained prior statements of two witnesses and constituted possible *Brady* material. *Brady v. Maryland*, 373 U.S. 83 (1963). They argued that the prosecutor failed to inform the grand jury that certain witnesses were not credible. These contentions need not detain us. First, the tapes in question were produced in time to be used on cross-examination and, moreover, the court permitted appellants to recall any witnesses for further examination if necessary. In the absence of prejudice, even assuming a violation of *Brady*, reversal is not required. *United States v. Campagnuolo*, 592 F.2d 852, 861 & n. 9 (5th Cir. 1979). Second, there is no requirement that the prosecution present impeachment evidence before the grand jury with respect to witnesses called before that body. *United States v. Adamo*, 742 F.2d 927, 936–38 (6th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 971 (1985). Failure to do so does not constitute prosecutorial misconduct. *Id.* at 938.

asserted his belief that the secrecy requirements of Rule 6(e) had been violated and urged that "an inquiry must be conducted by the Court to determine whether a violation of Rule 6(e) has occurred." In oral argument before the district court on the motion, counsel for Jones urged that "the grand jury secrecy requirements of Rule 6(e)" had been violated. The motion to dismiss was denied summarily by the district court from the bench.

As opposed to the emphasis on grand jury *secrecy* in the district court, on appeal, Jones, joined by the other appellants,[2] urged that the practice of swearing an investigative officer as an "agent" of the grand jury impinged upon the *independence and integrity* of the grand jury.

Before reaching the merits of appellants' argument, two procedural hurdles must be considered. Fed.R.Crim.P. 47 provides that a motion made in the trial court "shall state the grounds upon which it is made and shall set forth the relief or order sought." Moreover, pursuant to Fed.R. Crim.P. 12(b)(2), "[d]efenses and objections based on defects in the indictment" must be raised before trial. Failure to do so, in the absence of an extension granted by the court, results in waiver of the defense or objection. Fed.R.Crim.P. 12(f).

Appellants here failed to raise this claim before trial or to move for an extension of time to file a motion raising the claim. They also seek to advance arguments on appeal that were not presented to the district court. It has been held, under Rule 12(f), that "where a party has shifted his position on appeal and advances arguments available but not pressed below, and where that party has had ample opportunity to make the point in the trial court in a timely manner, waiver will bar raising the issue on appeal." *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir.), *cert. denied*, 431 U.S. 959 (1977) (citations omitted); *see also United States v. Sachs*, 679 F.2d 1015,

1018 (1st Cir.1982); *United States v. Seidlitz*, 589 F.2d 152, 160 (4th Cir.1978).

Appellants argue that their failure to challenge the indictment prior to trial should not result in a waiver because they were unaware of the grounds for this motion until McAllister was called as a witness at trial. Whatever the merits of this argument, we shall treat the district court's ruling on the motion, made without reference to its tardiness, as implicitly granting relief from the waiver as permitted by Rule 12(f). Moreover, because of the importance and novelty of the claim presented, and because Rule 47 does not specify that the grounds for the motion be presented "with particularity", we shall treat appellants' argument regarding the alleged violation of the independence and integrity of the grand jury as adequately preserved for appeal.

The importance of the role of the grand jury as an independent decision making body within the federal criminal justice system cannot be overstated. The grand jury represents a constitutionally-mandated barrier between the accused and the investigative and prosecutorial agencies of government, thus " 'protecting citizens against unfounded criminal prosecutions.' " *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 423 (1983), *quoting Branzburg v. Hayes*, 408 U.S. 665, 686–87 (1972).

The grand jury also serves in a separate but equally important role, as an investigative body empowered to call witnesses and to require the production of documents and other tangible evidence. *Sells, supra*, 463 U.S. at 424. The cloak of grand jury secrecy, rigidly enforced, furthers the investigative function. By assuring all witnesses of anonymity, those who otherwise would be reluctant or unwilling to testify will be more forthcoming. Secrecy also helps ensure the preservation of evidence and protects the reputations of those who ultimately are exonerated. *Id.*

---

**2.** It is unnecessary for us to decide, in light of our ruling on the issue, whether the other appellants properly preserved their objection for appeal. We assume, for purposes of this appeal, that Jones's motion was sufficient to preserve the issue as to all appellants.

By its nature this independent investigative body of lay citizens has limited means by which it can garner facts and evidence on its own. It must depend on the prosecutor "to secure the evidence or witnesses it requires." *Sells, supra*, 463 U.S. at 430. Once that evidence is obtained, moreover, the grand jury often requires the assistance of technical experts to assist in deciphering and analyzing the evidence that has been compiled, such as financial statements or ballistics reports. The temporary and ad hoc nature of the grand jury complicates the safe preservation and storage of the evidence, often including, as in this case, firearms, ammunition and explosives. In these and other aspects of its investigative function, the grand jury cannot be totally independent of the law enforcement agents and prosecutors on whom it necessarily must depend.

There is an inherent tension in the grand jury system that is caused by the need to maintain independence in decisionmaking both in fact and in the public perception, on the one hand, and the necessary reliance on government personnel to assist in the fulfillment of the grand jury's investigative function on the other. It is this tension that appellants seek to exploit.

■ Appellants on appeal have backed off from their contention, urged in the district court, that the disclosure of grand jury materials to McAllister violated the secrecy requirements of Rule 6(e)(2).[3] In any event, it is clear that such disclosure was permissible under the exception created by Rule 6(e)(3)(A)(ii).[4] *United States v. Lartey*, 716 F.2d 955, 964 (2d Cir.1983). Appellants, moreover, concede that McAl-

lister properly could investigate and report back to the grand jury, as well as summarize and retain custody of the evidence, all in his capacity as case agent. They challenge, however, the ceremony of swearing him as an "agent of the grand jury" because, in their view, this ritual endowed McAllister with more credibility than he otherwise would have had in the eyes of the grand jurors.

Two recent district court opinions outside of this Circuit have criticized the practice of swearing an agent of the grand jury. In *United States v. Kilpatrick*, 575 F.Supp. 325 (D.Col.1983), the court pointed out the absence of any express authorization for the practice in Rule 6, *id.* at 329, and attacked the "blurring of the 'investigative agency', 'prosecuting attorney' and 'grand juror' functions." *Id.* at 327. In *United States v. Anderson*, 577 F.Supp. 223 (D.Wyo.1983), the court focused on what it perceived as the potential for the practice to "undermine public confidence that the grand jury is performing its constitutional function to check the power of the government", *id.* at 232, and held that "It is well within a district court's supervisory powers to insure that the grand jury's integrity as an independent body is not destroyed in the public eye." *Id.* at 232–33. We shall address each of the assertions made in these cases.

First, it is difficult to see how the asserted enhancement of McAllister's credibility could have prejudiced these appellants. Appellants do not contend, nor could they in view of the weight of the evidence against them, that, but for McAllister's being sworn as an "agent of the grand jury", appellants would not have been indicted.

---

**3.** Fed.R.Crim.P. 6(e)(2) provides:

"(2) **General Rule of Secrecy.** A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the government, or any person to whom disclosure is made under paragraph (3)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any

person except in accordance with this rule. A knowing violation of Rule 6 may be punished as a contempt of court."

**4.** Fed.R.Crim.P. 6(e)(3)(A)(ii) provides that disclosure may be made to:

"(ii) such government personnel as are deemed necessary by an attorney for the government to assist an attorney for the government in the performance of such attorney's duty to enforce federal criminal law."

Absent a showing of actual prejudice, or a substantial threat thereof, the district court correctly denied appellants' motion to dismiss the indictment. *Cf. United States v. Morrison*, 449 U.S. 361, 365–66 (1981) (even deliberate violation of Fourth, Fifth or Sixth Amendments does not require dismissal of indictment absent showing of prejudice).

Second, with respect to the authority to swear such "agents", we find at least tacit acceptance of the practice by the Supreme Court, *United States v. Mara*, 410 U.S. 19, 20 (1973); *id.* at 24 (Douglas, J., dissenting), and by other courts of appeals. *E.g., In re Grand Jury Proceeding (Mills)*, 686 F.2d 135, 140 n. 4 (3d Cir.), *cert. denied*, 459 U.S. 1020 (1982); *United States v. Cosby*, 601 F.2d 754, 757–58 & n. 6 (5th Cir. 1979); *United States v. Stanford*, 589 F.2d 285, 292 (7th Cir.1978), *cert. denied*, 440 U.S. 983 (1979). In *Stanford*, the court viewed the practice as a laudable effort to help preserve the secrecy of the grand jury. *Id.*

Third, in the instant case McAllister was sworn by the foreman of the grand jury, not by the prosecutor as in *Kilpatrick, supra*, 575 F.Supp. at 328–29. Appellants do not argue that the grand jury foreman lacked the authority to swear government personnel who assist the grand jury. In our view, appellants place undue emphasis on the word "agent". McAllister was authorized under Rule 6(e)(3)(A)(ii) to perform the functions attributed to him by appellants. The foreman had the authority to swear him to secrecy. There is sufficient authority to permit the practice.

Fourth, we turn to the concern of the court in *Anderson, supra*, 577 F.Supp. at 232–33, that the public's perception of the integrity of the grand jury may suffer if this practice is permitted. The public's perception indeed is crucial to the effectiveness of the grand jury system. It provides moral suasion where legal authority to compel might be unavailable or impracticable. As with any government institution, whether legislative, executive or judicial, it provides legitimacy and authority for its decisions. We simply are not persuaded, however, that use of the word "agent" in connection with government personnel assisting a grand jury will undermine the foundation of public trust and confidence in the system. As long as the grand jury remains independent *in fact* of the prosecutor and does not become a mere tool to enhance the prosecutor's power, *Sells, supra*, 463 U.S. at 430, that confidence will continue and will be well-founded.

■ There is a strong presumption of regularity that attaches to grand jury proceedings. *Hamling v. United States*, 418 U.S. 87, 139 n. 23 (1974); *In re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1041 (3d Cir.1980). Appellants have failed utterly to sustain their burden of overcoming that presumption.

■ We hold that the swearing of Agent McAllister as an "agent of the grand jury" was not prosecutorial misconduct and did not warrant dismissal of the indictment. We further hold that, absent an initial showing of prejudice, the court did not abuse its discretion in denying appellants' request for an evidentiary hearing.

(B) *Enmons Instruction*

All appellants were convicted of one count of extortion to obstruct interstate commerce by force and violence in violation of the Hobbs Act, 18 U.S.C. § 1951 (1982)[5] and of one count of conspiracy to so obstruct commerce in violation of the Act. In *United States v. Enmons*, 410 U.S. 396

---

5. Section 1951(a) provides:

"§ 1951. Interference with commerce by threats or violence

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both."

**1002**

(1973), the Supreme Court held that the Act was not intended to reach acts of violence in furtherance of "legitimate union objectives". *Id.* at 400, 411.

Appellants' primary defense at trial was that the admitted acts of violence were intended solely to organize the nonunion workers at Ray-Mac. This they contend was a "legitimate union objective" within the meaning of *Enmons.* They assert that they should not have been prosecuted under the Act. In accordance with appellants' theory of the case, the court instructed the jury on the *Enmons* defense.[6] It is that instruction which appellants claim was error.

In *Enmons,* striking workers committed acts of sabotage against their employer's property in their pursuit of higher wages and other benefits. 410 U.S. at 398. The district court dismissed the indictment for failure to state an offense under the Act. *Id.* On direct appeal, the Supreme Court affirmed. *Id.* at 412.

The Court reasoned that the use of the word "wrongful" in the Act, as in "wrongful force" or "wrongful violence", would be superfluous if it described only the *means* employed to obtain property. *Id.* at 399. The Court concluded that the obtaining of property itself must be wrongful in the sense that "the alleged extortionist has no lawful claim to that property." *Id.* at 400. Thus, the Act does not "sweep within its reach violence during a strike to achieve legitimate collective-bargaining objectives." *Id.* at 404.

The Court, however, distinguished cases in which union officials or members use force or threats to extract payments to which they do not have a legitimate claim in the collective bargaining context, such as using threats to obtain personal payments or "wages" in return for "'imposed, unwanted, superfluous and ficticious services' of workers." *Id.* at 400, *quoting United States v. Green,* 350 U.S. 415, 417 (1956). Subsequent decisions of various courts of appeals have refrained from extending the rationale of *Enmons* beyond the facts of that case. *E.g., United States v. Cerilli,* 603 F.2d 415, 419 (3d Cir.1979), *cert. denied,* 444 U.S. 1043 (1980); *United States v. Duhon,* 565 F.2d 345, 351–52 (5th Cir.), *cert. denied,* 435 U.S. 952 (1978); *Quinn, supra,* 514 F.2d at 1257. In *United States v. Russo,* 708 F.2d 209 (6th Cir.1983), we held that *Enmons* does not apply to the extraction of payments in *violation* of the collective bargaining agreement because there could be no "'lawful claim to that property.'" *Id.* at 215, *quoting Enmons, supra,* 410 U.S. at 400.

In the instant case, appellants do not contend that they used violence to secure higher wages and benefits from *their* employer. Indeed, Jones and Stumbo seek to portray themselves as supporters of the strike by their own employees. Appellants argue that their defense at trial hinged on what they describe as their attempt "to persuade" the employees of a non-union company to join the UMWA and to enforce area wage standards being undermined by the non-union wage scale, despite the union's instruction not to strike.

■ We need not decide, however, whether *Enmons* applies, as a matter of law, to the use of violence outside of the collective bargaining context and in pursuit of goals other than higher wages and against individuals other than the strikers'

---

**6.** We assume, for purposes of this appeal, but without deciding, that appellants Jones and Stumbo were entitled to an *Enmons* instruction in the first instance. We seriously doubt, however, that employers whose conduct arguably constitutes an unfair labor practice in violation of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (2) and (3) (1982), can claim the *Enmons* defense. *United States v. Wilford,* 710 F.2d 439, 444 & n. 10 (8th Cir.1982); *United States v. Quinn,* 514 F.2d 1250, 1259 (5th Cir. 1975), *cert. denied,* 424 U.S. 955 (1976). More-

over, the evidence adduced at trial does not support Jones's contention on appeal that he was a "supporter" of the union in its pursuit of legitimate labor objectives. *United States v. Cusmano,* 729 F.2d 380, 383 (6th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 3536 (1984). The government, however, conceded in the district court that these appellants were entitled to the instruction and does not press the issue on this appeal. We, therefore, rule only on the issue of whether the instruction as given was a correct statement of the law.

employer. Although such goals, if accepted as genuine, fit loosely within the phrase "legitimate union objectives", it is doubtful whether the *Enmons* narrow limitation on the term "wrongful" encompasses such conduct. *Russo, supra*, 708 F.2d at 215. We believe, however, that the court's instructions were a correct statement of the law and we decide this issue on that ground.

The court instructed the jury, in part, as follows:

> "The *Enmons* exception is that legitimate activities by a labor organization or its representatives, honestly acting and representing its members, are not restrained by Title 18, United States Code, Section 1951 and that a legitimate labor objective cannot constitute extortion as defined by [that section], notwithstanding violence and threats may have occurred in support of such proper union objective."

Appellants do not challenge this instruction. Rather, they select various other statements from the charge, taken out of context, and argue that the entire charge was erroneous. We disagree.

■ The court carefully structured the charge so that it had two parts. The first assumes that appellants acted in pursuit of legitimate union objectives. The jury thus was instructed that

> "[I]n the matter in which it has heard evidence there is a labor dispute within the *Enmons* exception. That organizing the employees of a business so that they may have a union representative is a proper union objective within the *Enmons* exception. That picketing as herein defined is a legitimate labor activity in support of such goal within the *Enmons* exception.... If violence and threats honestly occur as a by-product of a legitimate labor activity, in support of a proper union objective, such acts cannot con-

stitute the extortion defined by [the Hobbs Act]."

Appellants isolate certain statements in the second part of the charge, which assumed a finding of improper purpose behind the acts of violence, and contend that those statements were erroneous. For example, appellants quote the following statement:

> "The use of firearms, firing pistols or rifles, in direction [sic] of employees of other employers, not in necessary defense of self or associate fellow pickets to coerce and prevent such employees from working is not a legitimate labor activity within the *Enmons* exception."

Appellants fail, however, to quote the statement that immediately precedes the above statement, which clearly sets the use of firearms in the context of an attempt "to wrongfully deprive or deny the right to do business and legitimately compete with another...." All of appellants' other claims of error on this issue are similarly flawed.

We do agree, however, that the statement "a legitimate act wrongfully performed may become unlawful and outside the protection of the *Enmons* exception" is somewhat confusing. A "single instruction to a jury may not be judged in artificial isolation," however, "but must be viewed in the context of the overall charge." *United States v. Parks*, 421 U.S. 658, 674 (1975).

We hold that, viewed as a whole, the court's *Enmons* instruction more than adequately focused the jury's collective mind on the distinction in *Enmons* between wrongful ends and wrongful means.

### III.

We have carefully considered all of appellants' other claims of error. We find all of them to be without merit and do not warrant extended discussion. We shall mention briefly, by way of example, a few such additional claims of error.

■ Appellants claim that an ambiguous statement by the prosecutor in his closing argument[7] improperly called attention to

---

7. The prosecutor stated:
   "Who were the timber rats? Ed R. [Panhandle] Moore. He is not here to tell us about it. But German [Stumbo] is."
   Moore was deceased at the time of trial.

the fact that appellant Stumbo did not testify. Assuming arguendo that the statement may be so read, we believe it is clear beyond a reasonable doubt that the jury still would have returned a verdict of guilty absent the statement. *United States v. Hasting*, 461 U.S. 509, 511 (1982). We hold that any error was harmless.

■ Appellants contend that the courtroom seating arrangements deprived them of their Sixth Amendment right to consult with counsel. Since the trial involved 18 defendants, they were seated in two rows immediately behind the counsel table. Appellants were permitted to pass notes to their attorneys. The attorneys were permitted to get up and hold conversations with their clients. No restriction was placed on communications during recesses. Under these circumstances, we hold that there was no Sixth Amendment violation. *United States v. Hart*, 551 F.2d 738, 739, 741 (6th Cir.), *cert. denied*, 434 U.S. 920 (1977).

■ Appellants argue that limitations placed on their cross-examination of three government witnesses deprived them of their Sixth Amendment right of confrontation by curtailing their ability to impeach the credibility of those witnesses. All three witnesses, however, were extensively impeached. Pearl Booth said that she was testifying pursuant to a plea agreement and that she had pending a motion for reduction of sentence. She testified that appellant Jones had broken promises to her and financially "broke" her and her husband. She also invoked the Fifth Amendment in the presence of the jury when asked about a bribe to a state official. Phillip Booth testified as to his plea agreement and that he was awaiting sentencing. He testified that he often lied when he had been drinking. He admitted three specific lies in pre-trial proceedings in this case. Phillip Moore was impeached with prior convictions. He also testified that he lied

to an undercover agent and that he committed perjury in previous judicial proceedings. Clearly, the jury was "in possession of sufficient information concerning formative events to make a 'discriminating appraisal' of a witness' motives and bias." *United States v. Touchstone*, 726 F.2d 1116, 1123 (6th Cir.1984), *quoting United States v. Campbell*, 426 F.2d 547, 550 (2d Cir.1970); *see also United States v. Smith*, 748 F.2d 1091, 1096 (6th Cir.1984). We hold that the court did not abuse its discretion in limiting cumulative cross-examination.

■ We also hold that the limitation placed on appellants' expert witnesses was not an abuse of discretion, *United States v. Kennedy*, 714 F.2d 968, 974 (9th Cir.1983), nor was the decision by the court to permit the government to introduce prior consistent statements to rehabilitate certain prosecution witnesses. *United States v. Hamilton*, 689 F.2d 1262, 1273 (6th Cir.1982), *cert. denied*, 459 U.S. 1117 (1983).

All of appellants' other claims of error similarly are without merit.[8]

### IV.

Despite the numerous claims of error urged by appellants in this Court, even appellants' counsel, in oral argument before us, commended the laudable efforts of the able district judge in the long and difficult trial of this case. We agree. As we have stated under similar circumstances, "[e]xperience teaches that while every additional day of trial increases the possibility of error, it correspondingly reduces the risk that any single error may have prejudicial effect upon the ultimate result." *In re Beverly Hills Fire Litigation*, 695 F.2d 207, 227 (6th Cir.1982).

Appellants were convicted after a fair trial on the basis of overwhelming evidence of serious crimes committed more than three years ago. We affirm the convic-

---

8. For example, appellants claim that a summary of financial reports was improperly admitted. Appellant Meade argues that his "theory of the case" instruction was not given and that he

should have been identified to the jury as the defendant to whom the coercion instruction was relevant. None of these contentions has merit.

tions of all appellants on all counts upon which they were convicted, and we order that the mandate issue forthwith.

Affirmed.