UNITED STATES of America, Plaintiff,

v.

Matthew TAYLOR, Defendant.

No. 93 CR 711.

United States District Court,
E.D. New York.

Jan. 10, 1995.

Zachary W. Carter, United States Attorney, by Ruth Nordenbrook, Lawrence Gerzog, Asst. U.S. Attorneys, E.D.N.Y., for plaintiff.

Richard Levitt, New York City, for defendant.

## MEMORANDUM AND ORDER

KORMAN, District Judge.

Matthew Taylor ("Taylor") was charged in a multi-count indictment with extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and other crimes. After a four week trial, Taylor was convicted of attempted extortion and extortion at two construction sites where the Flintlock Construction Company ("Flintlock") was the principal contractor. Count Twenty–Two charged that, on or about October 1, 1990, the defendant Matthew Taylor together with others

> attempted to obtain money for a Coordinator and employment for members of United Brooklyn at the Flintlock Construction, Inc. site on Roebling Street in Brooklyn, from and with the consent of Flintlock Construction, Inc., which consent the defendants attempted to induce by the wrongful use of actual and threatened force, violence and fear

(the "Roebling Street site"). In almost identical language, Count Twenty–Four charged Taylor with extortion at the Hewes Street construction site on or about July 1, 1991 (the "Hewes Street site"). The only difference was that Count Twenty–Four charged Taylor with attempt to commit extortion as well as the consummated offense of extortion. The earlier count was limited to the inchoate crime of attempt. Moreover, Taylor was charged both as a principal and as an aider and abettor in both counts.

Taylor moved for a judgment of acquittal, alleging that there was insufficient evidence to show he directly extorted or attempted to extort the specific property alleged in the indictment, i.e., "money for a Coordinator and employment for members of United Brooklyn." While Taylor impliedly conceded that the evidence was sufficient to sustain a conviction for obtaining subcontracts for his companies from Flintlock at the two sites, Tr. 6, Oct. 21, 1994, he argued that these subcontracts cannot sustain his conviction on Counts Twenty–Two and Twenty–Four because he was not charged with obtaining them by extortionate means. Taylor also moved under Rule 33 for a new trial, citing recanted testimony. These motions were denied prior to sentencing. The purpose of this memorandum is to set forth in detail the reasons for these rulings.

### Facts

Matthew Taylor and Delroy Collins ("Collins") founded United Brooklyn ("UB") in late 1987 or early 1988. Tr. 501. UB was one of a number of so-called "coalitions" operating in New York City, which the prosecution alleged subjected the construction industry to continuous extortionate conduct. While Taylor did not testify, the defense at trial was predicated on the assumption that the conduct in which UB and other coalitions engaged was necessary to force construction contractors to employ minority workers.

The evidence, however, showed that UB was an organization that used extortionate tactics to make money for Taylor and his associates under the guise of obtaining jobs for minorities. Indeed, the jury was instructed that otherwise extortionate conduct was not a violation of the Hobbs Act if it was

used to further "good faith attempts to obtain jobs for minorities, [from] contractors or subcontractors who the defendants reasonably believe discriminate against minorities and in hiring employees ... or [who] they reasonably believe failed to obey laws regarding the employment of minorities." Tr. 3219. *Cf. United States v. Enmons,* 410 U.S. 396, 401, 93 S.Ct. 1007, 1010, 35 L.Ed.2d 379 (1973) (Hobbs Act does not reach "the use of violence to achieve legitimate union objectives"). Thus, the jury found beyond a reasonable doubt that the purpose of the extortionate acts at the Roebling and Hewes Street sites was not to obtain jobs for minority workers from contractors who discriminated against minorities.

Critical to the commission of the extortion scheme pursued by Taylor and his accomplices was the "shape."[1] Collins testified that a "shape" is "when the people come to the office seeking jobs, we considered those the shape members. Shaping is going on the jobs, construction sites, looking for work." Tr. 498. The "shape" would use "threats" or "fights" or physical interference with the work, such as "pull[ing] the plug on the generator" or "turn[ing] over equipment," Tr. 513–14, to get the contractor to hire some UB members and to pay a "coordinator" designated by UB.

Taylor also owned several companies that provided security or performed subcontracting work (the "Afro companies"). Part of the UB modus operandi was to approach the contractor for jobs and coordinator payments, and then to extort subcontracts for these Taylor-owned companies. Collins described the use of the UB "shape" for these purposes:

Q: Now who got the contractors to sit down with Matthew Taylor about his ... security company and contracting company ...

A: It all started with the shape. Going to the job either—going to the job either

from demonstrating the job, bringing the contractor to what we call to the table. Tr. 876–77.

UB was not the only such coalition operating in New York during this period. Taylor was indicted along with members of other coalitions using methods similar to UB to extort money and jobs from construction contractors. *See, e.g.,* Tr. 509. One of the "benefits" of signing up with a coalition such as UB was that, if other coalitions subsequently showed up at the site, these other coalitions would probably not press their extortionate demands. Pursuant to an understanding between them, most coalitions would yield to the first coalition that had been retained by the contractor. *See* Tr. 509–510. UB was also one of the largest coalitions and would use force if it was not shown such deference. *See* Tr. 543.

The person designated by UB to deal with other coalitions was sometimes, although not always, designated as the "coordinator." The "coordinators" would receive a set weekly salary unrelated to any efforts that they were required to undertake on the contractor's behalf. While it was a matter of dispute whether the "coordinator" was a legitimate position, there was sufficient evidence for the jury to conclude that the salary was provided for little or no work and that it was essentially designed as a cover for a "seldom show," if not a "no show," job. Indeed, Andrew Weiss, the president of Flintlock, declined to pay $1500 a week to a UB designated coordinator at the Roebling Street site. Weiss testified that the position was nothing more than a "no show" job, and that such payments were not permissible on a federally funded project. Tr. 903.

Taylor founded, financed and controlled UB. Taylor put up the money to start UB, handled the cash before UB got a bank account, and arranged for UB's incorporation. Tr. 746–48, 875. When UB moved into its Fourth Avenue office in January, 1991, Taylor paid for the rent and telephones out of his own pocket. Tr. 518, 746. Collins or Taylor

---

1. The term is apparently derived from the noun "shape-up"—"a former method of hiring longshoremen in which the applicants appeared daily at the docks and a union hiring boss chose those who would be given work." *The Random House Dictionary of the English Language* 1311 (unabridged ed.1966).

would personally lead the "shapes" at the beginning. Tr. 503. Early UB business cards said "Organizer: Matty Afro Taylor," referring to Matthew Taylor. Tr. 508. Taylor's brother, Mert Taylor, was also involved in UB. Tr. 502.

Although Collins was the *de jure* President of UB, Tr. 875, Taylor was the *de facto* head of UB. Taylor decided which construction sites would be approached, Tr. 641–42, 794, and he and Collins would decide, once a "shape" convinced a contractor to hire a coordinator, who would get the money and the position. Tr. 525. Taylor took money for various coordinator positions, and used his control to gain "most" of the coordinator positions for himself. Tr. 773. As Collins testified:

Q: Now why did … Matthew Taylor, have so many coordinators' positions, as compared to you and your brother?

A: 'Cause he was the boss.

Tr. 535. One tape of a conversation between Taylor and a coalition member named Angel, recorded in early 1992, exemplifies Taylor's direct involvement in targeting construction sites to be approached by the "shape." During that phone conversation, Taylor gives Angel a list of jobs to "go by" and he tells Angel to "get information that he can from the foreman about the jobs" on Hall Street. Tr. 641. Angel asks "what do you want me to do on Hall Street, shut them down?" and Taylor replies "make the guy call me." Tr. 642.

At some point in 1992, after the extortionate acts alleged in Counts Twenty–Two and Twenty–Four, Taylor "distanced" himself from UB because he feared he was being investigated. Tr. 792. While Taylor spent less time at UB headquarters, he nevertheless continued to actively monitor and control its day to day activities. Collins described Taylor's relationship with UB during that period in the following colloquy:

A: I mean, he'll call in. I would still have to report to him and let him know day in and day out activity, as well as any other organizers. He'll meet with them after work, before work, call each other and talk about what taking place today or what happened or what to do before the day start, either what particular job he might want us to go to that morning or the next day.

Q: You were the head man, correct?

A: No. Down in the office, inside United Brooklyn, I was in charge of day to day activities down there, but *as the overall boss I was not.*

Tr. 794–95 (emphasis added).

Turning to the counts of conviction, at the Roebling Street site, which is the subject of Count Twenty–Two, Taylor's subordinates initiated contact with Andrew Weiss, the president of Flintlock construction, in October of 1990. Consistent with the UB game plan, Collins initially sought a coordinator's position for UB. Specifically, Weiss testified that Collins came to him with another UB member to say they wanted a $1500 a week coordinator position for a person "designated from United Brooklyn." Tr. 902–03. Because Weiss considered the position to be a "no-show" job, Tr. 903, he called Victor Sims. Sims headed the BLES coalition, which had been associated with Flintlock's projects in the Bronx. Tr. 963–64. Sims said he would "take care of it," meaning UB's attempt to extort a coordinator's position. Tr. 903. Sims then called Taylor and asked him "basically to leave us alone [and] Flintlock will try and give you some jobs on the site." Tr. 904.[2] Because Flintlock did not yield to the demands that it hire a "coordinator" at the Roebling Street site, and because any UB workers working at that site were actually employed by Flintlock's subcontractors, Tr. 929–30, Count Twenty–Two charged

---

2. Taylor argues that Weiss' testimony about these statements between Sims and Taylor, which were admitted without objection, were hearsay. Hearsay evidence admitted without objection may be considered by the jury to the extent of its probative value, *United States v. Check,* 582 F.2d 668, 677 n. 28 (2d Cir.1978), and will support a conviction challenged on the grounds of insufficient evidence. *See United States v. Foster,* 711 F.2d 871, 877 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984). In any event, because Taylor acknowledged to Weiss he had spoken to Sims, Tr. 904, the admissibility of the Sims–Taylor conversation is, at best, harmless error.

Taylor with the attempted extortion of "money for a Coordinator and employment for members of United Brooklyn."

Notwithstanding the relatively narrow scope of the charges in Count Twenty–Two, the extortionate activities at the Roebling Street site did not end with the failed attempt to obtain jobs or a coordinator's position for UB. On the contrary, they followed the UB script of extorting subcontracts for Taylor's companies. Indeed, Weiss testified to repeated work stoppages caused by UB at the Roebling Street site, perhaps as many as ten to fifteen, until he agreed to give the Taylor-owned Afro companies work as subcontractors on the Roebling Street job. Tr. 907–08, 997–98. Weiss described the character of these work stoppages in the following colloquy:

A: [T]he bus came to the site. People get out of the bus, start chanting for all the workers to put down the tools and stop. At that point, we—as we've advised all the workers on our jobs—to put their tools down and stop. We don't want any fighting or anything happens at that point. If someone doesn't—doesn't stop, or they—they start running through the building. . . .

Q: Have there—have there been instances in your experience where the workers, for whatever reason, did not immediately put their tools down?

A: Yes.

Q: What happens then?

A: We had two workers hurt on Metropolitan Avenue.

Tr. 935. When Weiss gave the Afro companies "some subcontracts," the work stoppages ceased. Tr. 1020.

The extortionate activity at the Hewes Street site, which is the subject of Count Twenty–Four, followed a pattern similar to the activity at Roebling Street. At Hewes Street, however, Taylor contacted Weiss directly. Over a period of time Taylor, Collins, and another UB member repeatedly contacted Weiss to say that "[t]hey wanted . . . some

part of the work." [3] Tr. 938. When Weiss failed to respond to these phone calls, "on a daily basis, the job was stopped." *Id.* In response to the work stoppage, Flintlock took on some UB members. In answering a question asking whether Flintlock needed these additional workers, Weiss testified that he thought hiring these workers would end the labor unrest:

A: At the time, we thought . . . by taking workers out of the coalition, we would satisfy them and not—not have to do other things . . .

Q: Did the fact that you put workers on satisfy them?

A: It satisfied the United Brooklyn end. But there was not the Afro end of wanting to have contract work.

*Id.*

While Weiss did not testify that anyone from UB asked for a coordinator's position at the Hewes Street site, he did testify that he paid a coordinator for Flintlock, and that Taylor and Collins decided the coordinator checks would go to Raquel Batson. Tr. 944. On the Hewes Street site, Taylor also sought and obtained work for the Afro companies, Tr. 932–34, although these subcontracts were not alleged in Count Twenty–Four to have been property obtained by extortion.

### The Motion for a Judgment of Acquittal

Taylor does not seriously argue that the evidence was insufficient to sustain a conviction for obtaining subcontracts from Flintlock by extortionate means at the Roebling and Hewes Street sites. Indeed, during the argument on the motion for a judgment of acquittal, he suggested that the United States Attorney had mistakenly drafted these two counts because they charged him only with attempting to obtain, and obtaining, "money for a Coordinator and employment for members of United Brooklyn." Tr. 6, Oct. 21, 1994. Taylor argues that, because there was no evidence directly linking him to this effort to obtain payments for a UB-designated coordinator or jobs for UB members from Flintlock at either the Roebling or

---

**3.** Weiss described Taylor's extortion style as "businesslike" but "with an edge of a knife of

United Brooklyn behind him." Tr. 1050.

Hewes Street sites, the guilty verdict returned by the jury must be set aside.

The starting point for the analysis of defendant's motion for a judgment of acquittal is *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), *reh'g denied* 329 U.S. 818, 67 S.Ct. 26, 91 L.Ed. 697 (1946). The Supreme Court there held that, even in the absence of evidence showing that a defendant participated directly in the commission of substantive offenses on which his conviction rests, he is not entitled to a judgment of acquittal if the substantive offenses were committed in furtherance of an unlawful agreement or conspiracy of which the defendant was a member. As Justice Douglas explained in *Pinkerton:*

> The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all. An overt act is an essential ingredient of the crime of conspiracy.... If that can be supplied by the act of one conspirator, we fail to see why the same or other acts in furtherance of the conspiracy are likewise not attributable to the others for the purpose of holding them responsible for the substantive offense.

328 U.S. at 647, 66 S.Ct. at 1184.

The evidence in this case was concededly sufficient to establish that the defendant was the central figure in an ongoing multi-membered conspiracy among the leadership of UB to engage in extortionate shakedowns of contractors under the guise of obtaining jobs for minorities. There was more than ample evidence for the jury to conclude that these substantive offenses were committed by the defendant's co-conspirators "in furtherance of the conspiracy", that they fell "within the scope of the unlawful project" and that they could be "reasonably foreseen as a natural or necessary consequence of the unlawful agreement." *Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. at 1184–85.

Taylor erroneously stresses the importance of his acquittal on the conspiracy charge in his motion for acquittal on the substantive counts. The conspiracy charged in Count One of the indictment, however, was broader than the connection necessary to find Taylor guilty of aiding and abetting other UB members. The charged conspiracy required proving an agreement *between* the different coalitions to commit extortionate acts. Supplemental instructions responding to a note from the jury specifically excluded conviction for an intra-coalition conspiracy:

> If, with respect to a particular defendant, you find that the defendant simply entered into an agreement with other members of his own coalition to commit extortionate acts, that would be the separate conspiracy. *And if that's all there was, then you would have to find that defendant not guilty.*

Tr. 3991 (emphasis added). Thus, even if the jury believed Taylor conspired with other UB members to commit extortion, it could not have convicted him on the conspiracy count unless the jury also found that Taylor had conspired with members of other coalitions.[4] Accordingly, the acquittal on the conspiracy count does not preclude the application of the *Pinkerton* holding. Nevertheless, *Pinkerton* is not a complete answer to the defendant's motion because the jury was not charged on the "elements" necessary to justify a conviction on the theory of criminal responsibility articulated in *Pinkerton*.

While this circumstance suggests that the guilty verdict on the substantive counts cannot be sustained on the basis of the *Pinkerton* holding, *Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949), it does not follow that

---

4. When other members of UB were tried under a superseding indictment in this case, which charged them with conspiring only with members of UB to commit extortion, all but one were convicted. Indeed, with the exception of that acquittal, eight of Taylor's top lieutenants at UB were convicted of extortion by plea or verdict.

the defendant is entitled to a judgment of acquittal. On the contrary, if the evidence is sufficient to sustain a conviction, the case stands on the same footing as one in which the jury was not charged on all of the essential elements of the offense. Because the deficiency is in the charge and not the evidence, the defendant is entitled at most to a new trial rather than a judgment of acquittal. *United States v. Markiewicz*, 978 F.2d 786, 804 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1065, 122 L.Ed.2d 369 (1993) (conviction vacated and case remanded for a new trial for failure to charge knowledge as an element of the offense where evidence was sufficient to prove that missing element).

The result is even more compelling here because of the manner in which the problem arose. The case involved a multi-count and multi-defendant indictment that took four weeks to try. When the defendants moved for a judgment of acquittal at the close of the case-in-chief, I chose the option provided by F.R.Crim.P. 29(b), to defer ruling on the motions until after the verdict. This course was taken to avoid hours, if not days, of lengthy and protracted argument and the further delay of the trial resulting from my need to carefully sift through the evidence in order to decide the motions. If argument had been had on the defendant Taylor's motion, I would have denied the motion directed to Counts Twenty–Two and Twenty–Four because this case is a *Pinkerton* paradigm. If the defendant was not entitled to a judgment of acquittal at the close of the case-in-chief or at the close of the entire case, it is difficult to understand on what basis he is entitled to a judgment of acquittal after he has been convicted.

While a new trial is the only remedy to which the defendant would arguably be entitled, even that remedy is not available here. This is so because the jury was properly instructed on an alternative theory of liability "founded on the same principal" as *Pinkerton,* namely that the defendant who does not participate directly in the commission of an offense may be found guilty if he "causes, procures, or commands another to commit a crime." *Pinkerton,* 328 U.S. at 647, 66 S.Ct.

at 1184. Tr. 3225–26 (jury instruction on aiding and abetting).

Particularly apposite here is the holding in *Nye & Nissen v. United States,* 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). The Supreme Court there held that where the evidence shows that the defendant was intimately involved in a "long and persistent scheme" to commit a series of crimes, a jury verdict of guilty can be sustained on an aiding and abetting theory, even in the absence of evidence that the defendant directly participated in the commission of any one of those substantive offenses. 336 U.S. at 619, 69 S.Ct. at 770. The defendant in *Nye & Nissen,* Moncharsh, was president, director and part owner of a company that defrauded the government by filing false invoices. Moncharsh was charged with conspiracy to defraud and with six substantive counts of fraud, relating to the six fraudulent invoices. The jury convicted Moncharsh of the conspiracy charge and of the substantive counts of fraud. Moncharsh argued that the substantive convictions could not stand because there was no evidence of his direct involvement in the participation of fraudulent invoices that formed the basis for the substantive offense.

Although the Supreme Court agreed that, absent the appropriate charge, *Pinkerton* could not be applied to sustain a guilty verdict, it sustained the convictions because "the case was submitted to the jury under an equally valid theory," aiding and abetting. 336 U.S. at 618, 69 S.Ct. at 769.

> [T]here is evidence that [the defendant] was the promoter of a long and persistent scheme to defraud, that the making of false invoices was a part of that project, that the makers of the false invoices were Moncharsh's subordinates . . . that he was the manager of [the business] . . . that he had charge of the office where the false invoices were made out. Those activities extended throughout the period when the substantive crimes were committed. They constitute ample evidence in a record reeking with fraud that Moncharsh was *associated* with the presentation of the six false invoices.

336 U.S. at 619, 69 S.Ct. at 770 (emphasis added).

There are arguably two alternative readings of *Nye & Nissen*. The first is that the jury could infer from circumstantial evidence of the kind present there that the defendant must have knowingly participated in some way in the substantive offense. This is the reading of *Nye & Nissen* urged by the defendant in an unpersuasive effort to distinguish that case from the facts here. On the other hand, there is support for an alternative reading of *Nye & Nissen* that would hold the "conscious promoters" or organizers of a criminal enterprise or an illicit scheme responsible for the affirmative acts undertaken by their subordinates, even if a specific criminal act was undertaken without their knowledge or direct supervision.

> There is ample authority in support of the principle that the directing heads of a corporation which is engaged in an unlawful business may be held criminally liable for the acts of subordinates done in the normal course of business, regardless of whether or not these directing heads personally supervised the particular acts done or were personally present at the time and place of the commission of these acts.

*Carolene Products Co. v. United States,* 140 F.2d 61, 66 (4th Cir.1944), *aff'd* 323 U.S. 18, 65 S.Ct. 1, 89 L.Ed. 15 (1944). *Cf. United States v. Dilliard,* 101 F.2d 829, 834 (2d Cir.1938), *cert. denied,* 306 U.S. 635, 59 S.Ct. 484, 83 L.Ed. 1036 (1939) (executive head of a business criminally liable as a "conscious promoter" of a scheme of fraud); *United States v. Amrep Corp.,* 560 F.2d 539 (2d Cir.1977), *cert. denied* 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978) (where evidence shows "active and knowing participation" by corporate officers in setting up a fraudulent sales program, the officers are equally liable with the corporation for its acts of fraud). These cases are consistent with the principle that

> *[a] culpable aider and abetter need not perform the substantive offense, need not fully know of its details, and need not even be present.* To obtain a conviction for aiding and abetting, the government must show that the defendant associated himself with the crime, participated in it as some-

thing he wished to bring about, and sought by his actions to make it succeed.

*United States v. Pepe,* 747 F.2d 632, 665 (11th Cir.1984) (footnotes and citations omitted) (emphasis added). *See also United States v. Sampol,* 636 F.2d 621, 676 (D.C.Cir. 1980).

Under this line of authority, if Taylor directed Collins to find construction sites to be approached for extortionate demands, Taylor would be guilty as an aider or abettor even if Collins selected and approached a particular site without the prior knowledge of Taylor. The evidence was sufficient to show far more involvement on Taylor's part than merely directing Collins to find construction sites. Indeed, even if *Nye & Nissen* stands for the more limited principle urged by Taylor, the evidence of his involvement in the affairs of UB and its extortionate activities is sufficient to permit the jury to infer that he must have been involved in the initial decision of Collins to approach the Roebling and Hewes Street sites. *See, e.g., United States v. Teitler,* 802 F.2d 606, 614 (2d Cir.1986) (circumstantial evidence of agreement to defraud, including defendant's role as partner in the law firm and testimony that defendant knew firm regularly engaged in fraudulent activities, was sufficient to sustain a conspiracy conviction without any direct evidence that defendant had agreed to participate).

Taylor ran United Brooklyn as a "long and persistent scheme" to commit extortion. He founded the coalition with his own money, controlled and supervised its daily activities and dictated who would profit from the various coordinator positions extorted from construction sites. His subordinates went out on the "shapes," and their practice was to check in with him about where to go and what to do there. The taped conversation with Angel corroborated Collins' testimony that, even after Taylor ostensibly "distanced himself" from UB, he would call in to discuss which sites coalition workers would go to on what days. Indeed, because every contractor approached for jobs and coordinators' positions by UB would also be pressured to hire the Afro companies, it is unlikely that Taylor would be uninterested or uninvolved

in the selection of construction sites to be visited by the "shape."

The evidence with respect to the Hewes Street site is particularly compelling because Weiss testified to a direct approach from both Collins and Taylor, and because in that instance as well contracts were obtained for the Taylor-controlled Afro companies. Taylor incorrectly cites Weiss' testimony for the proposition that his "efforts" at Hewes Street "were directed exclusively at obtaining subcontracting jobs at these sites for one or more of his 'Afro' companies." Def. Mem. of Law at 8. While Weiss did testify that Taylor sought and obtained subcontracts at the Hewes Street site, Tr. 932–34, he also testified that, when the work stoppages occurred, he hired United Brooklyn workers to "satisfy" Taylor and his associates:

Q: Tell us about the work stoppages at the Hughes [sic] Street job?

A: We started the excavation at Hughes Street. And Delroy [Collins] called me. Matthew [Taylor] called a few times. And Ezra called. That they weren't getting a piece of the work. And I was trying to avoid all—trying to take the calls at all. And then on a daily basis, the job was stopped some time during the day. We did put some workers on at the time on that. And eventually worked up to where we had a meeting to give out the tile work with, I believe, Matthew and Ezra . . .

Q: And did you already have—or were these workers that you felt you needed to get the job done?

A: We did need some workers. At the time we thought we were going to get two phase—by taking the workers out of the coalition, we would satisfy them and not—not have to do other things. And the other time, we didn't need workers. We did both.

Q: Did the fact that you put workers on satisfy them?

A: It satisfied the United Brooklyn end. But not the Afro end of wanting to have contract work.

Tr. 938.

Taylor points to Weiss' statement, that hiring UB workers "satisfied the United Brooklyn end" but not "the Afro end," as evidence that Weiss only gave Taylor subcontracts in response to the labor unrest. Def. Letter of Oct. 7, 1994 at 2–3. On the contrary, the jury could conclude that the statement showed that Taylor and others at UB sought *both* jobs for UB members *and* subcontracts. Weiss wanted to satisfy "them," meaning Taylor, Collins and the other UB members. He hoped that hiring coalition workers would "satisfy them" and he would "not have to do other things," presumably meaning give in to their additional demands for subcontracts. Weiss' decision to hire the workers "satisfied" one of their demands, "the United Brooklyn end" but not the further demand for subcontracting work. *See* Tr. 938.

Taylor argues that the evidence shows that coalition members, including Collins, occasionally pursued "frolics and detours" of their own and that the evidence is insufficient to show that the approaches at Roebling Street and Hewes Street were undertaken on behalf of UB. This argument is without merit. The evidence showed that the approaches at the Roebling and Hewes Street sites were consistent with the extortionate scheme Taylor and Collins put in place, namely an initial demand for jobs and money for a coordinator followed by the use of the UB "shape" to extort subcontracts for the Taylor-controlled companies. While Taylor's argument, that Collins was acting "ultra vires," would have some merit if Collins had used the UB "shapes" solely for his own benefit at the Roebling and Hewes Street sites, the fact that the "shape" was used in the manner conceived by Taylor to benefit himself provided ample basis for the jury to conclude that Collins was not on a "frolic and detour" of his own when he initially demanded a coordinator's fee and jobs for UB.

Significantly, on the Hewes Street site there is direct evidence of Taylor's involvement in the extortionate demand for jobs and no doubt that Collins was acting in furtherance of the extortionate scheme of which Taylor was the architect. On the Roebling Street site, Collins told Weiss that he wanted a $1500 a week coordinator position for a

person *"designated from UB."* [5] More significantly, after Taylor was apprised of this approach and the inability of Flintlock to make these payments, the UB "shape" continued numerous work stoppages at the Roebling Street site until the Taylor-controlled Afro companies were awarded subcontracts. While the use of the UB "shape" to extort subcontracts would not, without more, be sufficient to convict Taylor of aiding and abetting the *attempt* to extort a coordinator's position and jobs from UB, it provided additional circumstantial evidence to rebut the suggestion that Collins' approach at the Roebling Street site was anything other than an act in furtherance of the extortionate scheme that Taylor aided and abetted.

### The Motion for a New Trial

A motion for a new trial based on newly discovered evidence is "granted only with great caution." *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987) (citations omitted). "Courts are particularly reluctant to grant such motions where the newly discovered evidence consists of a witness recantation as such recantations are 'looked upon with the utmost suspicion.'" *Id.* (citations omitted). *DiPaolo* recites the three-part test for granting a new trial based on recanted testimony: 1) the testimony was false and material; 2) without it the jury probably would have acquitted the defendant; and 3) the defendant shows good cause for not producing it earlier. *Id.* (citations omitted). Taylor's motion for a new trial based on recanted testimony fails to meet the high standard required by the Second Circuit. Taylor submits a four-page affidavit from Weiss and argues that Weiss significantly "recants" his trial testimony. This recantation is suspicious because it comes from one of the many fear-stricken contractors who testified at trial and who still operate construction sites in New York City. More significantly, it is hardly a recantation of any material evidence.

Weiss' affidavit fails to question essential elements of his testimony, and is not inconsistent with his testimony at trial, let alone a recantation. The affidavit states that "[m]y contacts with Taylor at [the Roebling and Hewes Street] sites concerned, exclusively, his desire to obtain contracts for his own company, rather than a benefit for United Brooklyn." The only possible "recantation" is the statement that Taylor's approaches to Weiss were "exclusively" directed at getting subcontracts for Afro, rather than jobs and coordinators' payments. This statement, however, does not contradict anything Weiss said about Taylor's involvement at the Roebling or Hewes Street sites.

Regarding Weiss' contacts with Taylor at Roebling Street, Weiss never testified that Taylor directly asked him for money for a coordinator's position there. *See* Tr. 902–05. The importance of Weiss' testimony regarding Taylor's actions at the Roebling Street site and the Sims–Taylor conversation [6] is that it constituted additional circumstantial evidence rebutting the suggestion that Collins was off on a lark of his own. Specifically, Taylor followed the common scheme or plan of using UB to extort contracts for Afro after being informed about Collins' approach.

As for the Hewes Street site, although Taylor characterizes Weiss' statements about exclusively seeking subcontracts as a "recantation," Def. Letter of October 20, 1994, they are nothing more than an attempt to clarify, in a manner favorable to Taylor, Weiss' statements at trial describing his conversations with Taylor at the Hewes Street site. *Compare* Weiss Aff. *with* Tr. 938. While the affidavit places a different gloss on the trial testimony than that which appears from a reading of the transcript, it does not contradict anything Weiss actually said about Taylor's involvement at the Hewes Street site. The "clarification" provided in the affidavit

---

5. This evidence was admissible against Taylor because it was made in furtherance of a conspiracy for which there was ample evidence. *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987).

6. The affidavit reflects confusion about the conversations with Victor Sims. Although it is undisputed that Sims contacted Taylor about UB's approaches at the Roebling Street site, the affidavit places this contact with Sims at the Hewes Street site. Weiss never testified that Sims had anything to do with the Hewes Street site.

could easily have occurred during cross-examination at trial. A Rule 33 motion is not an appropriate substitute for clarifying cross-examination that a defendant chooses to avoid for strategic reasons.

In addition to the statement that Weiss' conversations with Taylor "exclusively" concerned contracts for Afro, Weiss includes in his supplemental affidavit the statement that only Collins, not Collins and Taylor, told him to give coordinators' checks to Raquel Batson. Weiss' actual testimony was that Taylor and Collins *decided* that Batson would get the checks. He never testified as to who actually told him to give the checks to Batson. *See* Tr. 944. In any event, the payments to Raquel Batson were not linked to either the Roebling or Hewes Street sites and they do not provide the basis for the convictions on either Count Twenty–Two or Twenty–Four. Instead, the testimony regarding Taylor's involvement in the designation of a coordinator at Roebling Street constituted a piece of cumulative evidence regarding Taylor's intimate involvement in the affairs of UB.

■ To the extent that the motion seeks a new trial in the interests of justice, rather than on the grounds of newly discovered evidence, there is no basis for the application. Even if Taylor's direct contact with Flintlock was limited solely to the concededly extortionate demands for subcontracts, and even if the Weiss affidavit contradicted Weiss' trial testimony in this regard, the evidence established that the demand for these subcontracts was simply part of the common scheme or plan in which the final step was a demand for subcontracts for Taylor. There is ample evidence that Taylor aided and abetted the entire scheme. Indeed, because of the persuasive evidence of the defendant's guilt, a motion for a new trial must be denied. *See United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir.1992) (deliberately false trial testimony does not justify a new trial in the interests of justice unless the jury probably would have acquitted without that testimony).

### Conclusion

Taylor's motions for a judgment of acquittal and for a new trial are denied.

SO ORDERED.